EASTERN ELECTRICAL COMPANY *vs.* TAYLOR WOODROW
BLITMAN CONSTRUCTION CORPORATION.

Middlesex.   November 5, 1980. — January 20, 1981.

Present: GRANT, CUTTER, & NOLAN, JJ.

*Contract,* Joint enterprise. *Joint Enterprise.  Uniform Partnership
Act.  Joint and Several Obligation.  Joint Obligation.*

General Laws c. 108A, the Uniform Partnership Act, does not have direct
    statutory and mandatory application to joint ventures which include
    corporate participants but has relevance to such joint ventures only by
    way of analogy and only when the use of the analogy in particular cir-
    cumstances will achieve a just result.  [196-198]
In an action to recover on a subcontract between the plaintiff and two
    corporations engaged in a joint venture, a judgment of dismissal in
    favor of one of the defendants because of the plaintiff's failure to
    answer that defendant's interrogatories did not preclude the plaintiff
    from pursuing its claim against the other defendant where the terms of
    the joint venture agreement delineated sharply contrasting duties and
    largely separate areas of responsibility as to each defendant; where the
    subcontract was signed in behalf of the joint venture and of each joint
    venturer and contained no express statement that the defendants in-
    tended to be bound only jointly; and where the judgment of dismissal
    was on purely procedural grounds and could reasonably be treated as
    based on a defense personal to that defendant.  [198-207]

CONTRACT.   Writ in the District Court of Natick dated
August 21, 1974.

On removal to the Superior Court, the case was heard by
*Young,* J., on a motion for summary judgment.

*W. Bradley Ryan* for the defendant.

*C. William Altenhof* for the plaintiff.

CUTTER, J.   On May 19, 1971, Eastern Electrical Com-
pany (Eastern) entered into a written subcontract with
Taylor-South Company (not incorporated, so far as the rec-
ord shows), the name of a joint venture set out in Art. II of a

1970 joint venture agreement between Taylor Woodrow Blitman Construction Corp. (Taylor), a Delaware corporation, and South Construction Co., Inc. (South), a Massachusetts corporation. The joint venture was for the purpose of constructing an apartment complex in Brockton for Southfield Gardens Company (the owner), a limited partnership formed under G. L. c. 109. This was to be done under a Federal Housing Administration cost-plus-a-fixed-fee contract. Eastern's fixed-price subcontract was for the electrical work on the project. It was signed for Eastern by its president and by Taylor-South Company as follows:

> Taylor-South Company
> By:  /s/ Harold G. Basser
> For:  Taylor Woodrow Blitman Construction Corp.
>
> By /s/ Lester Gross (L.S.)
> Taylor-South Company
> For:  South Construction Co., Inc.

Harold G. Basser was a vice president of Taylor. The record does not show what office Lester Gross held in South.

Eastern has fully performed its subcontract and has not been paid $11,024.36, the amount remaining due. An action to recover from Taylor the amount due was brought by Eastern in 1974. South was joined as a codefendant on March 5, 1975. On March 11, 1976, Eastern's complaint against South was dismissed because of Eastern's failure to answer interrogatories asked by South. It was not until May 15, 1979, that Eastern sought to have this dismissal vacated. Mass.R.Civ.P. 60(b). See note 12, *infra*. The motion was denied on May 31, 1979.

Eastern on June 11, 1979, for a second time,[1] sought summary judgment against Taylor for the balance due on the

---

[1] Eastern on November 21, 1978, had filed an earlier motion for summary judgment against Taylor. This was denied on January 2, 1979,

subcontract. The trial judge allowed the motion. In his memorandum of decision he stated that Taylor's only defense to Eastern's action was the contention "that since its liability to Eastern is joint and not several, the dismissal of the action against its co-venturer South causes it to abate against Taylor as well." The trial judge properly rejected this contention.

The trial judge assumed (on principles adopted by some text writers, see part 2, *infra*) that "[j]oint venturers are actually partners." He correctly noted that, under the Uniform Partnership Act, G. L. c. 108A, partners are *jointly and severally* liable (a) for certain torts, c. 108A, § 13, and (b) for a partner's misapplication of money, c. 108A, § 14. See § 15(*a*). He also assumed that (if the members of a joint venture are to be treated as partners and as subject to c. 108A) joint venturers are only *jointly* liable for all other debts and obligations of the joint venture. See § 15(*b*). He then (quoting from a Reporter's note to Restatement [Second] of Judgments § 109, at 91 [Tent. Draft No. 4, 1977]) assumed that the Uniform Partnership Act § 15(b), dealing with true partnerships, also requires that the liability of the joint venture and its participants to Eastern be treated as joint (and not as joint and several), subject to the application of a principle mentioned in *Balley* v. *Davis*, 75 Idaho 73, 77 (1954).

---

because there remained then an issue of fact whether Taylor-South and the owner had retained the amount claimed by Eastern as "guarantee covering . . . [Eastern's] work" on the subcontract as permitted by Art. XXI of the subcontract. This issue of fact was eliminated when Taylor admitted that it was not withholding final payment as a guarantee, but because it had not received final payment from the owner. It should be noted that a general partner of the owner was also South's president and had signed the cost plus construction contract both in behalf of the owner and in behalf of South. To some extent the owner and South thus were represented by the same person. This may explain the seemingly dominant position of South under the 1970 joint venture agreement. See discussion *infra*, parts 7-8, 14. It also suggests that in some degree, the owner and South may have been the real joint venturers rather than South and Taylor.

In the *Balley* case, the Idaho court was considering the plaintiff's contract with a partnership of three men to drill a well on the plaintiffs' land. The plaintiffs dismissed with prejudice the action against two partners, but continued to press for recovery against a partner who had not appeared in the action and had been defaulted (at 74-75). It was held that the dismissal of the action against two partners operated to dismiss the action against all of the partners and thereafter the partnership and its property could not be bound. The Idaho court in the *Balley* case said (at 77): "The partnership obligation of appellants being a joint obligation and not a joint and several obligation, the suit must run against all the partners and the judgment must be against all the partners jointly or against none of them *save and except where one partner has a defense personal to himself*. . . . 68 C.J.S., Partnership, § 235 b., page 728; 40 Am.Jur., Partnership, Section 446, pages 441-2" (emphasis supplied).

The trial judge in the present case ruled that "when Eastern failed to respond to South's interrogatories, South, by virtue of Mass.R.Civ.P. [33 and] 37 then had 'a defense personal to [itself]'"[2] and that when "that defense resulted in dismissal of Eastern's claim as to South, Eastern could, nevertheless, pursue its claim against Taylor." The trial judge then ordered judgment for Eastern against Taylor for the whole unpaid balance owed to Eastern. He commented that this was "a common sense result. Eastern having satisfactorily performed its contract and conferred a benefit on

---

[2] The judge referred to the decision of the Appellate Division of the District Courts in *Porter* v. *Ackerman,* later affirmed by the Supreme Judicial Court, 380 Mass. 936 (1980). The scope of defenses, personal to one of two or more joint obligors, has been spoken of as "a matter of personal exemption or discharge, whether such exemption arises from an incapacity to contract . . . or by matter of subsequent discharge as in . . . bankruptcy." See *Mackintosh* v. *Chambers,* 285 Mass. 594, 598-599 (1934); *Riley* v. *Burns,* 304 Mass. 15, 17 (1939); 2 Williston, Contracts § 327, at 672-673 (3d ed. 1959) (hereinafter Williston); 4 Corbin, Contracts §§ 929, 937, at 722-723, 776 (1951) (hereinafter Corbin).

the joint venture, it ought to be paid." He went on to suggest that Taylor "may satisfy the judgment out of the assets of the joint venture and, to the extent [that] it must satisfy the judgment out of its own assets, may treat such payment as a contribution to the joint venture in any future accounting between Taylor and South."

We agree that the trial judge reached the just, "common sense result." Further analysis, however, is required. Among issues which must be considered are (a) the extent to which the Uniform Partnership Act (G. L. c. 108A) has any *mandatory* application to this joint venture, Taylor-South; (b) whether, under current general principles of contract law, the obligation of Taylor and South to Eastern on its subcontract must be regarded as joint or may be treated as joint and several; and (c) whether, under modern procedures, the judgment against Eastern in its complaint against South is sufficiently a defense personal to South as to allow recovery by Eastern against Taylor (to which Eastern equitably is entitled).

1. The Massachusetts law concerning joint ventures is not fully developed, especially where a corporation or corporations purport to be coventurers. In *Whittenton Mills* v. *Upton*, 10 Gray 582, 598 (1858), it was held that the corporation, a party to that case, could not form a partnership with an individual. See *Rosenblum* v. *Springfield Prod. Brokerage Co.*, 243 Mass. 111, 115-117 (1922). The *Whittenton Mills* decision, and others like it elsewhere, have led to the use of joint ventures for quasi partnership operations of two or more corporations. In *Mendelsohn* v. *Leather Mfg. Corp.*, 326 Mass. 226, 233 (1950), it was said of a joint venture, "The exact nature of this relationship has never been precisely defined in our decisions and we make no attempt to do so now. For present purposes, it is sufficient to state that it resembles a partnership and has many of its attributes." See *Cardullo* v. *Landau*, 329 Mass. 5, 8-9 (1952); *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 624-626 (1964),[3] where the subsidiary facts did not indicate

---

[3] See for earlier cases, *Beatty* v. *Ammidon*, 260 Mass. 566, 575-576 (1927); *Edgerly* v. *Equitable Life Assur. Soc.*, 287 Mass. 238, 243 (1934);

that the arrangement there considered "was to be a joint venture within that indefinite term's ordinary usage."[4]

2. Recent texts and some decided cases (see e.g. *Wheatley* v. *Carl Halvorson, Inc.*, 213 Or. 228, 235 [1958]) have tended to regard joint ventures as wholly or substantially partnerships in many respects here material. Undoubtedly, there has been a trend in that direction. See 2 Williston, § 318B, at 585 et seq., § 318C, at 623-624; Barrett & Seago, Partners and Partnerships, Law and Taxation c. 2, §§ 7, 8 (1956 and 1974 supp.). This, however, does not necessarily mean that the Uniform Partnership Act (G. L. c. 108A; see St. 1922, c. 486) governs directly the activities and liabilities of joint ventures and their members.

3. It would be possible, perhaps, to construe G. L. c. 108A, § 6, and c. 4, § 7, Twenty-third, as subjecting corporate joint ventures to the statute. General Laws c. 108A, § 6, reads in part: "(1) A partnership is an association of two or more *persons* to carry on as co-owners a business for profit . . ." (emphasis supplied). "Person" is not defined in c. 108A, § 4. It is defined, however, in G. L. c. 4, § 7, which reads in part, "In construing statutes the following words shall have the meanings herein given, unless a contrary intention clearly appears . . . Twenty-third, 'Person' . . . shall include corporations, societies, associations and partnerships." If § 6 were to be interpreted as including corporations within the term "persons," then it might be said that c. 108A had general application to at least some joint ventures, although the limited time term and scope of most joint ventures, even then, might prevent

---

*Berwin* v. *Cable*, 313 Mass. 431, 435 (1943). See also *DeCotis* v. *D'Antona*, 350 Mass. 165 (1966).

[4] Many cases from Massachusetts and elsewhere, and various text and periodical authorities discussing joint ventures and their attributes are collected in the *Air Technology* case, 347 Mass. 613, 624-625 & nn. 14-15. Others are mentioned in Crane & Bromberg, Partnership §§ 9, 23B(b), 35, 50(e), 68 (1968); Reuschlein & Gregory, The Law of Agency and Partnership § 266 (1979).

that result.  See *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952), where it was said of "a joint adventure" that it "differs . . . from a partnership in that it is ordinarily, although not necessarily, limited to a single enterprise, whereas a partnership is usually formed for the transaction of a general business.  As between the parties, as in the case of a partnership, the relationship of joint adventurers is a matter of intent and arises only when they intend to associate themselves as such."

4.  At least one Massachusetts decision did not apply the Uniform Partnership Act so as to override other provisions of general law.  See *Edgerly* v. *Equitable Life Assur. Soc.*, 287 Mass. 238, 242 (1934), where the uniform statute was held not to have "changed the previously existing law with respect to the incapacity of a married woman to make a contract of partnership with her husband."  At 243, the same principle was extended to a joint venture.  We are of the opinion that the Uniform Act also should not be interpreted as having direct statutory and *mandatory* application to at least joint ventures which include corporate participants, in the absence of some explicit legislative extension of the act's coverage to such joint ventures.  See 2 Williston, § 318B, at 601.  To give the act such application would cause it to override what remains (after G. L. c. 156B, § 9A, inserted by St. 1969, c. 392, § 7) of the *Whittenton Mills* case (see part 1, *supra*).  Accordingly, we treat the uniform act as having relevance to joint ventures with corporate participants only by way of analogy and only when the use of the analogy in particular circumstances will achieve a just result.

5.  In the *Edgerly* case (part 4, *supra*), it was said that the "relation of joint adventurers, like a partnership, is created by a contract express or implied and, without such a contract, no liability for debts arises out of the transactions, unless . . . there is some independent ground of liability."  287 Mass. at 243.  And see the language from the *Cardullo* case quoted above (at the end of part 3, *supra*).  See also *Morrison* v. *Morrison*, 320 Mass. 133, 134 (1946).  As with other

contracts, one which may create a joint venture will be examined to see what the objective undertakings of the parties were. See *Shinberg* v. *Garfinkle*, 361 Mass. 109, 114 (1972); *St. Regis Paper Co.* v. *Stuart*, 214 F.2d 762, 766 (1st Cir. 1954), cert. denied, 348 U.S. 915 (1955). See also *Kravitz* v. *Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 209 (D. Mass. 1978).

6. The 1970 joint venture agreement and the subcontract with Eastern contain various provisions which suggest that the joint venturers should be treated as having incurred joint and several liability, rather than merely joint liability. We deal first with the joint venture agreement.

7. In the joint venture agreement the duties of the venturers are sharply contrasted and cover two clearly defined and largely separate areas of responsibility. (a) Taylor, described in the agreement as "Builders," is assigned all "[c]onstruction [m]anagement [s]ervices for the project on behalf of the [j]oint [v]enture," including "the direct supervision of all subcontractors." Taylor warrants that all construction work will comply with governmental requirements "within the scope of the [p]lans and [s]pecifications" and that the total cost will not exceed a stipulated cash upset price. Taylor further agrees to indemnify South, described in the joint venture agreement as "coordinator," for the amount of any excess. Taylor also undertakes to maintain safety precautions and to hold South harmless for any loss from injuries to persons or damage to property not reimbursed in full by insurance. Taylor is to pay any penalties for delay for which the joint venture may be liable. (b) South, as "coordinator," is to "have general supervision of the entire contract [with Southfield Gardens Company] on behalf of the [o]wner" and act as liaison with various governmental authorities interested in the project. South is to make available certain engineering talent in "order properly to utilize the experience of" South with the type of work involved. (c) Other provisions of the joint venture agreement point to Taylor as having special responsibility for

subcontracts[5] and as being in a subordinate position to South in various important respects.[6] In the matter of payment for the work of the joint venturers, instead of usual partnership arrangements for sharing of profits and losses (which may or may not be realized), the agreement speaks of "compensation" to each joint venturer.[7] (d) Finally, Art. XV[8] clearly shows that no general partnership was intended by the joint venture agreement.

---

[5] Such provisions include Art. VII, 2(a) and (b), which provide that Taylor is to "be responsible for procuring and presenting to . . . [South] all bids for subcontracts and for purchase orders" in time for South to review them. Negotiations with subcontractors are to be conducted jointly and all contracts and purchase orders are to be executed jointly. Other such provisions, e.g. Art. VIII, 2, deal with the carefully defined costs for the project which include (f) the "amounts of all subcontracts entered into by the [j]oint [v]enture."

[6] Provisions which give South special powers of control over Taylor's actions are: Art. IX, 1, which provides that South, with the owner's written approval, may authorize extra work or change orders, and that, except in emergencies, no extra work or change is to be undertaken without a written order from South, and Art. XX which gives to South power to terminate the joint venture agreement "at any time without default by" Taylor. Article XX provides further that, upon notice of any such termination, Taylor shall cease performance and assign to South all Taylor's interest in the subcontracts and other arrangements and work connected with the construction contract. This provision obviously gives both the owner, of which South's president is a general partner, and South the power to rid themselves of Taylor at any time. See note 1, *supra*.

[7] See Arts. I, 7, and X which, taken together, provide that Taylor (in addition to the reimbursement of allowable costs) is to receive payment of an agreed amount for its general overhead and, as "full compensation for . . . [Taylor's] services," the opportunity for an affiliate of Taylor's to receive profit from certain subcontracts (to be awarded to the affiliate on a competitive basis). South is to receive "as full compensation" an amount equal to Taylor's "general office overhead allowance" plus certain surplus funds, if any, to be advanced monthly. As to losses, as has been pointed out above (in the first part of this par. 7), South, by specified indemnity arrangements, has placed upon Taylor much (if not all) of the risk of losses which may arise from construction activities.

[8] Art. XV reads, "No member of the Joint Venture shall in the name or on behalf of the Joint Venture, except as otherwise provided herein, without the consent in writing of the other, execute any contract, sign any bill of exchange, or promissory note, or contract any debt, or employ any of the money or effects thereof, or in any manner pledge the credit thereof.

"The relationship between the parties shall be limited to the performance of the Construction Contract in accordance with . . . this Agree-

8. The 1970 joint venture agreement thus in various respects establishes a relationship inconsistent with, and unlike, the usual fully cooperative, quasi fiduciary undertakings to each other of partners in a partnership or quasi partnership operation or of joint venturers. Compare *Kleinschmidt* v. *United States,* 146 F.Supp. 253, 256 (D. Mass. 1956); *Kravitz* v. *Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 209-210 (D. Mass. 1978). Instead, the agreement reveals separate corporate entities, one of which is, at least to some extent, under common management with its owner-customer, undertaking largely separate specified parts of a single project. The arrangement, as has been noted, leaves South, to some extent representing the owner, largely controlling the enterprise and substantially protected by the indemnification provisions imposed upon Taylor. (See *United States ex rel. Altman* v. *Young Lumber Co.,* 376 F.Supp. 1290, 1296 [D. S.C. 1974]). These considerations certainly support the conclusion that Taylor-South cannot appropriately be treated as a partnership between Taylor and South, governed by G. L. c. 108A, § 15(*b*). These considerations also support holding each joint venturer liable severally, as well as jointly, at least for the portions of the project for which they respectively have special responsibility, and in which their respective interests may be in major respects opposed to the interests of the other venturer. The interests of South also may be antagonistic to the interests of subcontractors who (if not in default) are entitled to support from their general contractor in moving for prompt payment from the owner under the cost-plus-a-fixed-fee contract. See note 1, *supra.*

---

ment. *This agreement shall be construed . . . to be a Joint Venture for the sole purpose of carrying out the Construction Contract. Nothing herein shall be construed to create a general partnership between the parties . . . .* [N]othing . . . herein shall permit either party to bid for or to undertake any other contracts for the other party or to act as the agent of the other Party unless authorized by . . . this Agreement" (emphasis supplied).

9. We turn next to the subcontract with Eastern. If Taylor's liability under that is not directly controlled by c. 108A, § 15(*b*), we should consider whether Taylor has incurred under it, in accordance with general contract principles, separate corporate liability to Eastern, even though it is stated to be a subcontract of the joint venture. As already pointed out, the subcontract of the joint venture is signed in behalf of the joint venture and of each joint venturer as required by the joint venture agreement (Art. VII, 2[b]). The liability is thus stated in the form of an agreement of a singular contractor but signed by plural obligors.[9] This form of signature has some tendency to indicate that each joint venturer was speaking for itself, although each signed also for "Taylor-South Company." There is no express statement in the agreement that the parties intended to be bound only jointly, a statement which could easily have been inserted if Taylor-South and its corporate components had wished fairly to warn its subcontractor of the hazards, under the older cases, inherent in accepting joint liability as opposed to "joint and several" liability. The joint venturers also gave some indication of separate, several corporate responsibility for the amount to become due to Eastern by making the subcontract "for *themselves*, their . . . *successors* and assigns" (emphasis supplied), a form which may have some tendency (see note 9, *supra*) to show separate and comprehensive assumption of liability.

10. Professor Corbin has pointed out that the distinction between "joint" and "joint and several" obligations largely grew out of now superseded procedural considerations. See 4 Corbin §§ 925-926, 928, 931. He would favor total aboli-

---

[9] See Restatement (Second) of Contracts § 112, Comment *c* (quoted at note 11, *infra*) and Illustration 6 (Tent. Drafts Nos. 1-7, rev., 1973). See also a helpful analysis of indicia that a promise by two or more persons for the same performance may create a joint and several (rather than merely a joint) obligation in 17A C.J.S., Contracts §§ 350, 354, 355, at 344, 350, 351 (1963). Section 112 of the Restatement is to be renumbered § 289 when Restatement (Second) of Contracts is published, probably in 1981. See *Federal Dep. Ins. Corp.* v. *Bismarck Inv. Corp.*, 547 P.2d 212, 214 (Utah 1976). See also *Hemmenway* v. *Stone*, 7 Mass. 58, 59 (1810).

tion of the distinction now that modern flexible procedures have been adopted generally which remove procedural obstacles to full several, as well as joint, liability of co-obligors for a single performance. See 4 Corbin §§ 923-926, 931, at 696, 699, 702, 709, 733. The distinction all too frequently may result in serious unfairness because of the rule that the voluntary discharge or release of one joint obligor discharges other joint obligors. Professor Corbin properly refers to this "as a trap into which many an obligee has fallen."[10] Id. § 936, at 736.

11. The new Restatement (Second) of Contracts, tentative § 112(2) and Comments b and c (see note 9, *supra*), does not go as far as Professor Corbin would go. It adopts the view that whether a particular contract imports a joint or a joint and several obligation as a matter of interpretation. Tentative §112(2) reads: "Where two or more parties to a contract promise the same performance to the same promisee, they incur only a joint duty unless an intention is manifested to create several duties or joint and several duties." Comment b to this provision refers to considerations which would have justified adopting in the Restatement an even more drastic weakening of the unfairness inherent in many aspects of "joint" obligations. Comment b reads: "The question whether promisors of the same performance undertake 'several' duties in addition to or instead of a 'joint' duty has traditionally been treated as a question of the application of deductions from legal concepts rather than as a question of manifested intention. *Where a 'joint' duty differs from 'joint and several' duties, the joint duty is in-*

---

[10] The adoption of the Massachusetts Rules of Civil Procedure, 365 Mass. 730 (1974), gave the Commonwealth flexible, modern rules which make of no procedural importance any distinction between joint and joint and several obligations. The new rules thus call for fresh examination whether the distinction continues to have validity or usefulness or, indeed, any aspect of fairness. That the Restatement does not go as far (see part 11, *infra*) is perhaps based upon a judgment as to whether existing decisional and statutory law, at the time of its consideration, had yet accepted Professor Corbin's views. See Restatement (Second) of Contracts § 112 (Tent. Draft No. 2, 1965).

*variably less advantageous to the promisee, while the advantage to the promisor does not normally serve any legitimate interest. Joint duties, as distinguished from joint and several duties, are likely to reflect ignorance or inadvertence on the part of the promisee.* But in the absence of statute both common-law courts and courts of equity long held promises of the same performance to be joint only unless the promises took a linguistic form appropriate to several duties. The modern tendency is to treat the question as one of interpretation and therefore to *give weight to manifestations of contrary intention in whatever form.* Subsection (2) reflects this tendency"[11] (emphasis supplied).

12. In the light of the considerations just discussed, there is strong reason for treating the obligations to Eastern of the joint venturers, Taylor and South, as several as well as joint. *First,* Taylor, under the joint venture agreements had primary responsibility for subcontracts. Whether Eastern knew of this aspect of the 1970 joint venture agreement does not appear from the record. Even if it did not know of the 1970 agreement, Eastern undoubtedly dealt primarily with Taylor, which was in charge of construction, and probably looked for payment primarily to Taylor which it sued first. *Second,* there is substantial ground (see part 11, *supra*) for treating the distinction between "joint" and "joint and several" obligations as having no continuing usefulness under modern Massachusetts procedures. Either of these grounds

---

[11] Comment c is closely related: "The fact that one promisor is under a duty to another to perform the promise or that one promisor has received all or the greater portion of the consideration does not prevent their duty from being joint rather than several or joint and several. But the fact that the promises are made in separate documents or are separately stated in the same document sufficiently shows an intention to undertake several duties. The standard modern form to create duties which are both joint and several is 'We jointly and severally promise,' but any equivalent words will do as well. *In particular, a promise in the first person singular, signed by several persons, creates joint and several duties"* (emphasis supplied). The promise, in the present case, of the joint venture in the third person singular, signed by each of the joint venture participants in its corporate name, might well be viewed in like fashion.

of action would achieve the equitable purpose of assuring that Eastern receive payment for work which it has fully performed.

13. We do not rest our decision on the grounds discussed above in parts 9 to 12, for to do so might involve more sweeping rejection of long standing (but probably outworn) authorities than is now necessary. Consideration of those possible grounds of decision, however, convinces us that limits should be placed upon application of the old rule (assuming that it should be applied at all) that at least a voluntary discharge or release of one joint obligor has the effect of releasing all joint obligors. As already noted, the trial judge treated the defense asserted by Taylor (based on South's 1976 judgment of dismissal of Eastern's complaint against it)[12] as a defense personal to South within authorities such as those cited above in note 2. This treatment was appropriate. Nothing in the record indicates that South, or indeed the owner, prior to the 1976 judgment, had any just claim on the merits that Eastern had not fully performed its sub-contract. Nevertheless, the 1976 default judgment of dismissal, has the effect, under Mass.R.Civ.P. 41(b) (3), 365 Mass. 805 (1974), of "an adjudication on the merits." See *Nasser* v. *Isthmian Lines*, 331 F.2d 124, 127 (2d Cir. 1964). Of course, the default

---

[12] The record does not disclose the circumstances of the 1976 judgment in favor of South by reason of Eastern's failure to answer South's interrogatories. An affidavit filed on May 29, 1979, by the president of Eastern suggests that the failure to answer interrogatories may have been that of earlier counsel for Eastern, and not of his client. Whether a judge (other than the trial judge) correctly denied Eastern's 1979 motion to vacate the 1976 default judgment of dismissal of Eastern's action against South is not before us. On the limited facts revealed on this record, we entertain doubt whether the original 1976 order of dismissal would have been entered had all the facts been before the court. See C.A. Wright & A.R. Miller, Federal Practice and Procedure §§ 2284, 2291, at 768-772, 817-819 (1970). Similarly, if all the facts were before the judge who denied the motion to vacate the default judgment, he might well have granted the motion, subject to the payment of costs and counsel fees by Eastern (or any counsel for Eastern responsible for the failure to answer interrogatories). See *Allied Artists Pictures Corp.* v. *Giroux*, 50 F.R.D. 151 (S.D. N.Y. 1970).

judgment involved no actual consideration of the merits of Eastern's claim but was imposed under Mass.R.Civ.P. 33 and 37, only because of Eastern's failure to answer South's interrogatories. In any event, the resulting discharge of South was in no sense either voluntary (see 4 Corbin § 931, at 736) or intentional. At most it should prevent further *direct* proceedings by Eastern against South and reasonably should be treated much as would a release because South had become bankrupt or had not been served because not subject to service within the Commonwealth.[13] Further proceedings against Taylor would not have been precluded by a judgment of dismissal in favor of South for either such reason. See 4 Corbin § 929, and note 2, *supra*. This holding may be a minor extension of these authorities which (as

---

[13] See 3A Moore's Federal Practice, par. 19.11, at 19-230-231 (1979). See also *Donald Manter Co.* v. *Davis*, 543 F.2d 419, 420 (1st Cir. 1976). Restatement (Second) of Contracts, §§ 117, 118 and 119 (Tent. Draft No. 2, 1965, probably to be §§ 290, 291 and 292, respectively, in the final publication) seem to recognize the propriety of this view. Tentative § 117 traces the historical background of the rules governing joinder for suit of joint promisors, as well as stating in the black letter rule of § 117(2) that an action may be maintained against joint promisors "without joinder of those beyond the jurisdiction of the court. . . . or those against whom the duty is not enforceable at the time of the suit." Tentative § 118 reads: "In an action against promisors of the same performance, whether their duties are joint . . . or joint and several, judgment can properly be entered for or against one even though . . . a different judgment is entered with respect to another, *except* that judgment for one and against another is improper where there has been a *determination on the merits* and the liability of one cannot exist without the liability of the other" (emphasis supplied). Comment b refers to the existence of individual defenses. Tentative § 119(1) reads: "A judgment against one or more promisors does not discharge other promisors of the same performance unless joinder of the other promisors is required by the rule stated in § 117. By statute in most States judgment against one promisor does not discharge co-promisors even where such joinder is required." Comment c deals essentially with the situation in the present case. It reads: "[I]n the nineteenth century, it was established that a judgment for one joint promisor did not discharge the joint duty of all if it was based on a defense peculiar to him. Originally applied to cases of lack of jurisdiction, contractual incapacity, discharge in bankruptcy, and statute of limitations, *this rule now applies to any defense not applicable to the co-promisors*" (emphasis supplied).

Taylor contends) relate largely to the status of persons asserted to have a defense personal to them. The extension, if it be one, seems to us a reasonable way of avoiding grossly unjust and unintended consequences of procedural dismissals, like the 1976 purely procedural judgment of dismissal of the claim against South.

14. The present record does not enable us to decide, as the trial judge suggested might be appropriate, whether Taylor, when it pays the judgment now to be entered against it in favor of Eastern, can charge the amount so paid as a construction cost, for which Taylor is entitled to credit in the settlement of the accounts of the joint venture and between the participants in the joint venture and the owner. That will depend on the facts concerning such matters as (a) what amounts the joint venture has been paid or is owed by the owner, (b) whether the upset price has been exceeded, (c) 'what each joint venturer has had in "compensation" or may have had to bear in losses, and (d) the extent to which South and the owner are or were under common management. The relevant facts are not fully before us. The account between the joint venturers will depend on the 1970 joint venture contract and on applying its provisions in a manner consistent with whatever fiduciary obligations have been assumed by Taylor and South under it, with respect to each other. An important consideration may well be whether South or the owner, or both, will be unjustly enriched if Taylor is not given credit for its payment of the judgment.

*Judgment affirmed.*