INFUSAID CORPORATION and Metal Bellows Corporation, Plaintiffs, Appellants,

v.

INTERMEDICS INFUSAID, INC., and Intermedics, Inc., Defendants, Appellees.

INFUSAID CORPORATION and Metal Bellows Corporation, Plaintiffs, Appellees,

v.

INTERMEDICS INFUSAID, INC., and Intermedics, Inc., Defendants, Appellees.

The Regents of the University of Minnesota, Appellants.

Nos. 83–1841, 83–1882.

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1984.

Decided May 30, 1984.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 7, 1984.

Harvey E. Bines, Boston, Mass., with whom Louis A. Rodriques, and Sullivan & Worcester, Boston, Mass., were on briefs, for Infusaid Corp. and Metal Bellows Corp.

Edwin A. McCabe, Boston, Mass., with whom Sydelle Pittas, George P. Field, and McCabe/Gordon, P.C., Boston, Mass., were on brief, for Intermedics Infusaid, Inc., and Intermedics, Inc.

Scott C. Moriearty, Boston, Mass., with whom Gerald L. Neuman, and Foley, Hoag & Eliot, Boston, Mass., on briefs, for The Regents of the University of Minnesota, amici curiae.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

In No. 83–1841, appellants Metal Bellows and Infusaid are both incorporated in Delaware with their principal place of business in Massachusetts. Infusaid Corporation is Metal Bellows' majority-owned subsidiary. Appellees Intermedics Infusaid and Intermedics are Texas corporations with their principal places of business in that state. The former appellee is the wholly-owned subsidiary of the latter, and throughout this opinion they are identified collectively as "Intermedics".

Central to this litigation is a device known as the infusion pump, a small, self-powered pump that may be implanted below the human skin for the purpose of administering drugs. The pump is at least in part the result of research by several professors at the University of Minnesota, and the University is now the assignee of a patent on the device issued to the professors in 1973. Two years before the patent was issued, however, the University granted a license (which has since been amended from time to time) to Metal Bellows for the manufacture of the pump's precision components. The pump is now coming into widespread use, especially for cancer patients. It has been received by the scientific community with considerable enthusiasm, and in 1982 the Food and Drug Administration approved its commercial use in humans under certain conditions.

As contemplated in the 1980 version of its license from the University, Metal Bellows assigned its interest to its subsidiary, Infusaid Corporation, which in turn granted a sub-license to Infusaid Company. Infusaid *Company* is the joint venture between Intermedics and Infusaid *Corporation* that is the subject of this litigation. Needless to say, there has been a falling out.

As a preliminary matter, we observe that Appellants have assumed throughout this litigation that partnership law controls the dispute. This assumption has not been challenged directly by Appellees, who stated at oral argument that they "don't think it matters whether or not" the Uniform Partnership Act (UPA) applies to this case. In our opinion, the matter is not quite so simple. There are some minor distinctions between a partnership and a joint venture, *see* 46 Am.Jur.2d *Joint Ventures* § 4 (1969), although only one of those distinctions, which is discussed in a later section of this opinion, is relevant to the appeal. More significant is the following language from *Eastern Electrical v. Taylor Woodrow Blitman Construction Corp.*, 11 Mass.App. 192, 414 N.E.2d 1023, 1027 (1981):

> We are of the opinion that the Uniform [Partnership] Act ... should not be interpreted as having direct statutory and *mandatory* application to at least joint ventures which include corporate participants, in the absence of some explicit legislative extension of the act's coverage to such joint ventures.... Accordingly, we treat the uniform act as having relevance to joint ventures with corporate participants only by way of analogy and only when the use of the analogy in particular circumstances will achieve a just result.

■ We note that at least one commentary states that even when a joint venture

is merely analogized to a partnership the UPA applies to the results of its wrongful dissolution, although we do not necessarily endorse this viewpoint. *See Crane and Bromberg on Partnership* § 35, at 192 (1968). In any case, we believe that this appeal presents "particular circumstances" such that application of the UPA will achieve a just result. This conclusion is based upon our inference that the parties *intended* for partnership law to govern their joint venture agreement. This inference is in turn based upon the January 20, 1981 amendment to the agreement, which was signed by both parties and provides that for federal income tax purposes "the venture shall be deemed to be and will file its income tax returns as a partnership." Plaintiff's Exhibit 2, "Amendment to Joint Venture Agreement" at 4, ¶ 12. The previous page of the same amendment adds a new section captioned "Liquidation and Dissolution of the *Partnership*" (emphasis supplied), although we must note that the original instrument states that captions are not to be considered part of the agreement. We believe that these provisions distinguish the association between the parties from the associations considered in the recent Massachusetts cases refusing to apply partnership law to joint ventures. *See Shain Investment Co. v. Cohen*, 15 Mass. App. 4, 443 N.E.2d 126, 129–31 (1982); *Eastern Electrical*, 414 N.E.2d at 1024–28.

Furthermore, although *Eastern Electrical* did not apply partnership law to the dispute before it, the opinion stated:

The Massachusetts law concerning joint ventures is not fully developed, especially where a corporation or corporations purport to be coventurers. In *Whittenton Mills v. Upton*, 10 Gray 582, 598 (1858), it was held that the corporation, a party to that case, could not form a partnership with an individual. See *Rosenblum v. Springfield Prod. Brokerage Co.*, 243 Mass. 111, 115–117, 137 N.E. 357 (1922). The *Whittenton Mills* decision, and others like it elsewhere, have led to the use of joint ventures for quasi-partnership operations of two or more corporations. In *Mendelsohn v.*

*Leather Mfg. Corp.*, 326 Mass. 226, 233, 93 N.E.2d 537 (1950), it was said of a joint venture, "The exact nature of this relationship has never been precisely defined in our decisions and we make no attempt to do so now. For present purposes, it is sufficient to state that it resembles a partnership and has many of its attributes."

414 N.E.2d at 1025–26. From this language as well as other passages of and cases cited in the opinion, *see id.* at 1025–27, we conclude that there was no real attempt by the Massachusetts courts to distinguish a partnership from a joint venture before the *Eastern Electrical* decision. This fact is significant because, as we have explained above, it is the intent of the joint venturers that controls the application of partnership law to this dispute, and *Eastern Electrical* was decided after the original draft of the joint venture agreement was completed. Therefore, we think that we can safely assume that the parties believed that partnership law would control their association.

With this preliminary matter disposed of, we turn to the merits of the appeal. The district court found that the parties entered into a joint venture agreement on January 20, 1981. The court further found that

[t]his agreement provided in part that Infusaid [Corporation] and [Intermedics] would develop, produce, manufacture and sell drug infusion devices. Intermedics would contribute $900,000 in cash immediately, together with such intellectual property as it owned or might acquire related to such products. Infusaid would contribute its licensing rights to certain intellectual property, records, test data, and other information relating to the development of that type of product.... From December of 1984 through June of 1985, Intermedics would make available to the venture up to three million dollars in loans, and would then have an option to buy Infusaid. A complicated formula provided for the price of the buy-out with adjustments for potential inflation and sales volumes during

the year 1984.... Control of the venture was to be in the hands of a management committee consisting of five members acting as a board of directors. The plaintiffs were to enjoy, and have enjoyed, control of the committee. [Under normal conditions, Infusaid Corporation appointed three members of the Management Committee, and Intermedics appointed two.] The agreement provided, however, that if Infusaid should at any time be in material default, Intermedics would have the right to appoint the majority of the committee until the default were removed or cured.

District Court Opinion at 1–2.

The district court also found that since its inception, Metal Bellows' infusion pump program had concentrated on a constant-flow device, but that Metal Bellows, along with Intermedics, had recognized the importance of developing a programmable, variable-flow pump. Indeed, the district court explained, "[B]oth parties would benefit if the joint venture could be first in the marketplace with an implantable *programmable* drug infusion device." *Id.* at 3 (emphasis in original).

During the first few months of the joint venture, Infusaid Corporation awarded valve design contracts to several vendors, including a $10,000 contract to Consolidated Controls Corporation (CCC). On April 16–17, 1981, a representative from CCC presented his company's work to various Intermedics and Infusaid Corporation personnel, including one Mr. Tucker. At that time, Tucker was president of Infusaid Company, and, the district court found, by way of this position Tucker "controlled the joint venture." In any case, it is clear that the meeting between Tucker and the CCC representative was distinctly unsuccessful. The district court found that the CCC representative "complained that by reason of Mr. Tucker and his attitude, [the representative] had reached a dead end working with Infusaid." Furthermore, the court found that "Mr. Tucker was the cause of the inability of Infusaid and Consolidated Controls being unable to get together."

In light of this "failure of the joint venture to work out a relationship with Consolidated Controls," Intermedics invited the CCC representative to give his presentation to Intermedics' management. The representative did so on April 24, 1981. Shortly thereafter, "CCC submitted a proposal to Intermedics as a result of which those two companies entered into an arrangement." The district court found that

it was fortunate for both [Intermedics and Infusaid Corporation] that when the relationship between the joint venture and Consolidated Controls was affected adversely by Mr. Tucker, that Intermedics' management was able to save the situation and entice the Consolidated Controls people into working with one of the parties to the joint venture.

Opinion at 5.

Furthermore, said the district court, "Intermedics never hid the fact that it was dealing with Consolidated Controls." *Id.* at 6.

Other dealings among Infusaid, Intermedics, and CCC are set out in some detail in the district court's opinion. In any case, on May 24, 1982, Infusaid Corporation and Metal Bellows filed suit in the district court, asking for a dissolution of the joint venture and an accounting and distribution of their interests in the venture. The basis for the complaint was that, according to the plaintiffs, Intermedics had breached its fiduciary obligations to them as partners in the following respects, among others:

(1) by engaging with CCC in the development of drug infusion systems that "will compete directly with the Infusaid Pump in the marketplace;"

(2) by developing "Intermedics Pumps" that incorporate intellectual property that is an asset of the joint venture;

(3) by refusing to place the development of the "Intermedics Pumps" under the direction and control of the venture's Management Committee; and

(4) by refusing to provide the venture with additional financing.

Except for the refusal to provide additional financing, these same allegations were re-asserted as breaches of the joint venture agreement.

After a nineteen-day trial, the district court issued an opinion dated October 13, 1983. In addition to the findings discussed above, the court found that

(1) there was "no merit" in the claim that Intermedics had misappropriated Infusaid Corporation's intellectual property,

(2) the evidence did not show that Intermedics had engaged in competition with the joint venture, and

(3) Intermedics had not violated any obligation that it had undertaken pursuant to the joint venture agreement.

The opinion concluded by stating:

As matters stand now, Intermedics is entitled to continue on the path towards the exercise of the option given to it by the agreement to purchase the Infusaid business. Intermedics is entitled to full disclosure of information concerning the venture and access to all business information under the agreement. It is specifically declared that the defendants' rights under this agreement have not lapsed; that the plaintiffs have attempted without right to oust the defendant, Intermedics, from the joint venture affairs and to deny Intermedics its right to purchase the venture. The conduct of the plaintiffs constitutes default under the agreement; hence, pursuant to Section 10.1 of the agreement, Intermedics is now entitled to "three members of the five-member management committee."

Opinion at 12.

The court added that Intermedics could "submit for signature a judgment declaring [its] rights and entitlements to these remedies following which a hearing will be ordered on the propriety of the suggested form of judgment." This procedure was followed, and on November 1, 1983, the court issued its Order and Judgment ("Judgment") granting Intermedics declaratory and injunctive relief.

The November 1 Judgment reiterated much of the October 13 Opinion. It stated that Intermedics had not breached any fiduciary or contractual duty owed to the plaintiffs and denied plaintiffs' requests for various forms of equitable relief, including that of dissolution of the joint venture. Of particular relevance to this appeal is the following provision of the declaratory judgment:

The plaintiffs have materially defaulted under the parties' joint venture agreement dated October 6, 1980, as amended, in that they have, without right, ousted the defendants from the affairs of the joint venture. They have, for more than two years, denied the defendants the benefits of technical collaboration which were the principal *raison d'être* of the parties' joint venture ....

Judgment at 4.

Infusaid Corporation and Metal Bellows base this appeal upon several arguments. The first of these is that the district court's denial of the request for dissolution was incorrect as a matter of law. Perhaps the most compelling facet of this argument is that the court was wrong "in ordering a continuation of the partnership despite Infusaid's unqualified right to dissolve." Brief for Appellants at 14. At oral argument Appellants cited both the Uniform Partnership Act (UPA) and *Karrick v. Hannaman*, 168 U.S. 328, 18 S.Ct. 135, 42 L.Ed. 484 (1897), as sources of this allegedly unqualified right. In making this assertion, however, Appellants have fused two relatively distinct approaches to dissolution. We now consider each separately.

The UPA reflects the common law distinction between dissolution of a partnership by judicial decree and what has been labeled "dissolution per se." *See* Bromberg, *Partnership Dissolution—Causes, Consequences, and Cures*, 43 Texas L.Rev. 631, 639 (1965). Mass.Gen.Laws ch. 108A, § 32, for example, states that "[o]n application by or for a partner the court shall decree a dissolution" if any one of several prerequisites have been met. On the other hand, Mass.Gen.Laws ch. 108A, § 31(2)

states quite plainly that dissolution may be caused "by the express will of any partner at any time," even "[i]n contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section." This is dissolution per se; when any of the events listed in § 31 take place, the partnership is dissolved without any action by any court. And it seems clear from the language of the statute itself that the "express will" of a partner is sufficient to dissolve the partnership in this fashion. *See also Bayer v. Bayer,* 215 A.D. 454, 471–72, 214 N.Y.S. 322 (N.Y.App. Div.1926).

As is evident from their complaint, Appellants originally sought dissolution of the partnership pursuant to § 32. They alleged that Intermedics had breached both the joint venture agreement and its fiduciary obligations to the Appellants, allegations that state a cause of action for dissolution under § 32(*d*). Obviously, the district court did not agree with these contentions.

■ Appellants ask that we reexamine the denial of their request for a § 32 dissolution. They say that, as a matter of law, the district court erred in denying the dissolution because "Intermedics' extrapartnership activities usurped the management function in breach of the [joint venture agreement]." The "extrapartnership activities" to which Appellants refer are those between Intermedics and CCC in which Intermedics retained CCC to design valve components necessary for a programmable pump. *See* Opinion at 5, 7. The "management function" is that established by Section 10.01 of the joint venture agreement, which, as noted above, provided that Infusaid Corporation appointed three members of the five—member committee that managed the venture. *See* Plaintiffs' Exhibit 2 at 17.

Despite its finding with regard to Intermedics' retention of CCC, and despite the apparently uncontroverted evidence that Infusaid Corporation, which controlled the management committee, repeatedly objected to the extrapartnership relationship between Intermedics and CCC, *see* Brief for Appellants at 29 & n. 24 and portions of the record cited therein, the district court held that Intermedics had not violated any provision of the joint venture agreement, as noted above. The basis for this holding is not completely clear. There is no real question that "a joint venture may exist although the parties have unequal control of operations," 46 Am.Jur.2d *Joint Ventures* § 12 (1969), so it cannot be that the district court thought the majority-control provision in Section 10.01 of the joint venture agreement to be invalid. And it is apparently uncontested, as we think it would have to be, that activities relating to the development of a programmable pump were within the ambit of the joint venture agreement, *see* Plaintiffs' Exhibit 2 at 2–3 & Schedule I, and that the Intermedics/CCC relationship contemplated such activities. Indeed, the district court found as much, as noted above.

In reaching this result the District Court may have concluded that where, as here, the contract with CCC was in an area of undisputed importance to the venture, Infusaid's failure to take even minimal steps either to preserve the work already done or to substitute a comparable proposal amounted to an abdication of managerial responsibility—a breach of its fiduciary obligation implied in the contractual provision granting Infusaid the right to manage. We need not finally resolve this, though, for even if we were to assume that Intermedics' dealings with CCC amounted to a technical breach of the joint venture agreement, the district court's findings adequately establish that in the complex circumstances of this case a substantial breach of the "wilful" sort contemplated as a basis for judicial dissolution under Mass. Gen.Laws ch. 108A § 32(1)(*d*) did not take place. While we do not need to delineate, for the purposes of this case, the precise reach of this language we think it clear that at a minimum the statute was designed to address breaches of a nature which would make it unreasonable for the

remaining partner to continue with the venture and not, as here, conduct that was quite supportably found to have furthered the contractual purpose, and toward which, at the time, there was evidence that Infusaid was ambivalent or at least vacillating.[1] Nor do its findings provide any basis for our now holding that Intermedics' dealings with CCC amounted to a breach sufficiently material to justify Infusaid's subsequent non-performance. *See Center Garment Co. v. United Refrigerator Co.*, 369 Mass. 633, 638, 341 N.E.2d 669, 673 (1976) (citing in part Restatement (Second) of Contracts § 268 (Tent.Draft No. 8, 1973) (now at § 243)).

The question now remains, however, whether there was a dissolution under § 31 of the UPA, otherwise known as "dissolution per se," as explained above. Although their complaint requested dissolution under a UPA § 32 theory, Appellants' oral argument before this court emphasized a § 31 approach to dissolution. Appellants stated that under *Karrick v. Hannaman* it is "clear" that "wrongful expulsion [of a partner from the partnership] is a de facto dissolution" and that all that remains for a court to do when suit is filed under such circumstances is to "confirm the dissolution and award the remedy" to the other partner. It is apparent, then, that Appellants are now seeking to use to their advantage the district court's finding that Infusaid Corporation ousted Intermedics from the partnership. Because the ouster rendered the dissolution a *fait accompli* at the time the suit was filed, the argument runs, the district court was without the power to order the continuation of the partnership or, to put the matter another way, to enjoin the dissolution.

To flesh out this argument we return to *Karrick v. Hannaman*, in which the Supreme Court stated (again in dicta):

No partnership can efficiently or beneficially carry on its business without the mutual confidence and co-operation of all the partners. Even when by the partnership articles, they have covenanted with each other that the partnership shall continue for a certain period, the partnership may be dissolved at any time, at the will of any partner, so far as to put an end to the partnership relation and to the authority of each partner to act for all, but rendering the partner who breaks his covenant liable to an action at law for damages, as in other cases of breaches of contract.

168 U.S. at 334–35, 18 S.Ct. at 138 (citations omitted).

We note that this principle certainly did not originate with the *Karrick* decision. No less a source than *Kent's Commentaries* had stated years before that

each partner has a power to·dissolve the connection at any time, notwithstanding any convention to the contrary, and that the power results from the nature of the association.... [I]t is for the public interest· that no partner should be obliged to continue in such a partnership against his will, inasmuch as the community of goods in such a case engenders discord and litigation.

3 *Kent's Commentaries on American Law* 56 (O.W. Holmes, Jr. ed., 12th ed. 1873) (citations omitted).

And there is no shortage of modern interpretations of this principle. As one state court has interpreted its version of the UPA,

[t]he Texas Uniform Partnership Act codifies the common·law rule so that every partner has the inherent *power* to dissolve his partnership even though the partnership agreement might attempt to limit that partner's *right* to dissolve the partnership. This would be true even though· in some circumstances, the exercise of this right to dissolve might constitute a breach of the partnership agreement and render the dissolving partner liable for damages resulting from the breach.

---

1. Although Intermedics admitted at oral argument that at some point Infusaid had objected to Intermedics' dealings with CCC, testimony at trial supports the conclusion that Infusaid's earlier attitude toward the Intermedics/CCC relationship had been positive.

*Woodruff v. Bryant*, 558 S.W.2d 535, 539 (Tex.Civ.App.1977) (emphasis in original) (citations omitted).

*Accord, Zuckman v. United States*, 524 F.2d 729, 737 (Ct.Cl.1975). *See also* H. Reuschlein & W. Gregory, *Handbook on the Law of Agency and Partnership* 348 (1979). Most important in this case is that the Massachusetts courts have apparently endorsed this plain-sense interpretation of § 31(2). *See Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 591, 328 N.E.2d 505, 514 (1975) (dicta). *See also State Street Trust Co. v. Hall*, 311 Mass. 299, 301, 41 N.E.2d 30, 32 (1942).

■ We have little doubt that Infusaid Corporation's ouster of Intermedics, as found by the district court, constituted a dissolution per se under Mass.Gen.Laws Ch. 108A, § 31(2). Although there was no formal notice of dissolution, an ouster of a partner is a sufficient expression of will to dissolve the partnership under a § 31 theory. *Cf. Simmons v. Wilson*, 250 S.W.2d 638, 640–42 (Tex.Civ.App.1952) (finding dissolution of joint venture to have occurred in the course of a conversation between the venturers); *Mills v. Williams*, 113 Or. 528, 233 P. 542 (1925) (finding dissolution in one partner's taking over management of partnership's ranch). At this point, then, we must question the propriety of the district court's permanent injunction, *see* Judgment at 5, against a dissolution per se that had already taken place. Part of our dismay with regard to the injunction is based on the fact that neither the opinion nor the judgment below contains any finding that a legal remedy would have been inadequate in this case. Of course, the general rule is that if there is an adequate remedy at law, equitable relief is unavailable. 27 Am. Jur.2d *Equity* § 87 (1966). Furthermore, *Karrick v. Hannaman* would find the injunction improper for another reason. The opinion states that, at least generally speaking, a court of equity will not prevent a dissolution because "it will seldom, if ever, specifically compel subsequent performance of the contract by either party, the contract of partnership being of an essentially personal character." 168 U.S. at 335, 18 S.Ct. at 138 (citations omitted). Of particular relevance to this appeal is the Supreme Court's statement that "[e]specially where, by the partnership agreement, as in the case at bar, the defendant is to supply all or most of the capital, and the plaintiff is to furnish his personal services, the agreement cannot be specifically enforced against the plaintiff and will not be enforced against the defendant." *Id.* Although, as we discuss below, one might question how "personal" the services provided by Infusaid to the joint venture were, the district court found that Intermedics was to provide the venture's funding. Opinion at 2, 8–9. And again, more recent, post-UPA-adoption decisions are in accord with *Karrick*. *See, e.g., Levy v. Firks*, 222 Cal.App.2d 429, 437, 35 Cal.Rptr. 207, 212 (1964) (Ford, J., concurring); *Engelbrecht v. McCullough*, 80 Ariz. 77, 79–81, 292 P.2d 845, 847 (1956). *See also McCollum v. McCollum*, 67 S.W.2d 1055, 1056 (Tex.Civ. App.1934) (pre-UPA).

Despite this wealth of precedent to the effect that a court cannot enjoin the dissolution per se of a partnership (and the lack of any citations to the contrary by Appellees), one matter gives us pause. Each of the cases cited above notes in some way the "personal services" aspect of a partnership. *Karrick v. Hannaman*, for example, labeled the contract of partnership as being "of an essentially personal character." 168 U.S. at 335, 18 S.Ct. at 138. It seems quite clear, then, that the refusal of these courts to enjoin the dissolution of a partnership is grounded in the close similarity between a partnership and a personal service contract. And, of course, few principles are more fundamental to our jurisprudence than the general prohibition against specific performance of personal service contracts. *See McClintock on Equity* § 63.

We have already explained that there are minor distinctions between a partnership and a joint venture. For many years, one of those distinctions was that a corporation was generally held to have no power to become a partner with an individual or another corporation but that it could associ-

ate to form a joint venture. 46 Am.Jur.2d *Joint Ventures* § 4, at 26 (1969). This prohibition has since fallen by the wayside in most states that have adopted the UPA, *see Crane and Bromberg on Partnership* § 9, although its status in Massachusetts is uncertain.[2] In any case, we think that a good argument can be made for the nonapplicability of the prohibition against specific performance of a joint venture or partnership agreement where all parties to the agreement are corporations *and* legal remedies have been found inadequate. This is because in many such instances the element of personal coercion that has rendered specific performance of a partnership agreement repugnant to so many of our courts is simply not present. But here again there are shadings. We say "in many such instances" because the fact that all parties to the agreement are corporations does not *necessarily* mean that the relationship is without a significant "personal service" component. At oral argument in this case, however, Appellees characterized the business of the joint venture as an "ongoing, assembly line process," although the district court made no finding of this nature. If the district court were to find this characterization accurate, we believe the finding would bode well for the appropriateness of an equitable remedy.

■ Therefore, we hold that there is a strong presumption against specific performance of a joint venture or partnership agreement. Where all parties to the agreement are corporations and there has been a dissolution per se of the relationship, however, and legal remedies have explicitly been found inadequate, a court may order specific performance of the agreement *if* the relationship is found to be without a significant personal service component. That is, if the joint venture or partnership can be maintained as an ongoing, profit-making concern without obliging any officer or director of the corporation that per se dissolved the relationship "to continue in such a partnership against his will," 3 *Kent's Commentaries* 56, then specific performance may be ordered, again assuming the inadequacy of a legal remedy. By "specific performance" in this context we mean that the district court may order the corporate co-venturers to continue the business together *according to the terms of the joint venture agreement.*[3] According-

2. Massachusetts adopted a nonuniform version of § 2 of the UPA. *Compare* Mass.Gen.Laws ch. 108A, § 2 *with* Unif. Partnership Act § 2; 6 U.L.A. (1969). The uniform version includes corporations within its definition of "persons" who may associate as a partnership. Massachusetts, however, deleted the definition of "person" altogether.

3. We think that the district court's specific performance remedy as it stands now may well stray from the terms of the agreement in at least one regard. This error is manifested in the following passage, which we have already quoted in part:

> The plaintiffs have materially defaulted under the parties' joint venture agreement dated October 6, 1980, as amended, in that they have, without right, ousted the defendants from the affairs of the joint venture. They have, for more than two years, denied the defendants the benefits of technical collaboration which were the principal *raison d'être* of the parties' joint venture, and they have denied the defendants their right to free and full access to properties, books, records, and additional information and operating data relating to the venture. *The plaintiffs' defaults have not been, and cannot now be cured.* The defend-

ants therefore have the right to appoint three members of the Management Committee of the joint venture, pursuant to Section 10.01 of the parties' joint venture agreement.

Judgment at 4 (emphasis supplied).

We question the district court's holding that Infusaid Corporation's denial of technical collaboration and access to information is an *incurable* default. Such a denial may be remedied through a simple reversal of policy, a return to the earlier days of collaboration and unrestricted flow of information. Perhaps the district court perceived the default as incurable because the default placed the joint venture at some permanent competitive disadvantage. We do not think, however, that the agreement reflects a conception of curing a default as to broad as to include remedying all economic harm that may flow from that default. Instead, the provision seems addressed to particular behaviors on the part of the plaintiffs, "defaults" quickly cured, followed by a return of management control to Infusaid Corporation. On the other hand, it may be that the declaration of the default's incurability was merely part of the district court's effort to shape what it perceived to be the fairest possible remedy. By definition, however, specific performance orders the par-

ly, we remand this case to the district court for proceedings consistent with these principles. If the district court is unable to make the findings necessary to sustain the remedy of specific performance, then that portion of its order must be reversed.

■ Because we remand the case on these grounds, it is unnecessary to reach Appellants' other complaints regarding the district court's remedy. We do wish to acknowledge, however, the following concession made by Appellants at oral argument: "When an ouster has occurred, ... the partnership is de facto dissolved. The innocent partner has the right to damages for the breach of the partnership contract up to and including delivery of the partnership assets and the right to carry on the partnership business." We think that this is an accurate statement of the law. *See Crane and Bromberg on Partnership* § 75. Appellants' wrongful § 31 dissolution, therefore, may well entitle Intermedics to carry on the venture's business, at Intermedics' option, of course. "To do this, [Intermedics] must (1) pay or secure to the dissolving partner the value of his interest less any damages from his breach, and less any value attributable to good will, and (2) indemnify him against all partnership liabilities." *Id.* § 75, at 429 (footnotes omitted).[4] For now, we note that if the district court determines that specific performance is in fact inappropriate in this case, Appellants' current complaints will be moot. On the other hand, it seems clear that if the district court makes the findings necessary to uphold its original order, Appellants will appeal that decision as well, and we will consider their other grounds for dissatisfaction at that time.

Consolidated with this appeal by Metal Bellows and Infusaid Corporation is that of the University of Minnesota, No. 83-1882. As noted above, the University is the as-signee of a patent issued on the infusion pump in 1973, and Metal Bellows is the University's licensee for the pump's manufacture. The University now appeals from the district court's denial of the University's post-trial motions to intervene for the purpose of seeking a reformation of the district court's opinion in the Infusaid Corporation/Intermedics litigation. The University contends that certain dicta in that opinion "as a practical matter impede the University's ability to protect its interests in [the infusion pump] patent." Brief for Appellant University at 3.

In its brief the University argues at length how the district court's opinion "unnecessarily reflects upon the validity of [its] patent" and "may be cited for its *stare decisis* value" in some future litigation that involves the patent's validity. The University's own brief, however, makes plain that these arguments are without merit. It "recognizes that the opinion and judgment of the District Court have no direct effect on the validity of the University's patent." Brief for Appellant University at 16. Furthermore, it correctly acknowledges that "the University cannot be collaterally estopped" in some future patent litigation "by factual findings made in its absence" as a party in the Infusaid Corporation/Intermedics litigation. *Id.* at 17. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329–33, 91 S.Ct. 1434, 1443–45 (1971).

We think the University's own analysis of this point is dispositive of its appeal. Because the allegedly negative and unnecessary portion of the opinion is without collateral estoppel effect, any possible impropriety on the part of the district court is immaterial. Accordingly, the district court's denial of the University's motions to intervene is affirmed.

---

ties to perform *the agreement into which they entered,* not some "new" agreement developed by the court. In this case, to label Infusaid Corporation's default as incurable as a matter of equity is to abandon the confines of the agreement and to invoke the more general equitable powers of the court in a way that seems to us neither necessary nor appropriate.

4. We think that, because this remedy avoids the shortcomings of specific performance, it also is to be preferred over forcing the parties to continue working together.