WHITE CONSTRUCTION CO., INC. *vs.* COMMONWEALTH[1]
(and a companion case[2]).

Suffolk.    January 14, 1981. — March 31, 1981.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Release.   Contract,* Building, With Commonwealth.   *Commonwealth,*
Contract.   *Architect.*

A provision in a contract between the Commonwealth and an architectur-
   al firm for design and construction supervision services which
   unconditionally released the architect from all liability, including
   design errors, before construction on the project had even begun was
   inconsistent with the statutory requirements of G. L. c. 7, § 30C, as
   appearing in St. 1953, c. 612, § 5, and § 30E, as amended by St. 1962,
   c. 757, § 27, and was, therefore, unenforceable.  [642-649]


PETITION filed in the Superior Court on March 7, 1973.

The case was heard by *Connolly*, J., on motion for sum-
mary judgment.

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 24, 1979.

The case was heard by *Young*, J., on motion for summary
judgment and was reported by him to the Appeals Court.

*Christopher H. Worthington,* Assistant Attorney Gener-
al, for the Commonwealth.

*Richard L. Neumeier & Robert M. Gault* (*Philander S.
Ratzkoff & Alice D. Alexander* with them) for Desmond &
Lord, Inc.

---

[1] Desmond & Lord, Inc., third-party defendant.

[2] Commonwealth *vs.* Farwell Construction Corp.; Jefferson Construc-
tion Company; V & V Construction Co., Inc.; Loranger Construction
Corp.; and Desmond & Lord, Inc., defendants.  Sepp Firnkas Engineer-
ing, Inc., third-party defendant.

KASS, J.  Article XIII of the standard form of agreement employed — and drafted — by the Commonwealth in 1966 to hire architectural services conferred upon the architect an unconditional release of all liability, including design errors, before construction on the project involved even began.  Because the language of Article XIII effectively nullifies the statutory mandate of G. L. c. 7, § 30C, as appearing in St. 1953, c. 612, § 5, and § 30E, as amended by St. 1962, c. 757, § 27,[3] we do not give the text literal effect and reverse the judgments below.

Procedurally, the White Construction Co., Inc. (White), case began with a complaint under G. L. c. 258 against the Commonwealth in which White alleged, among other things, that the plans and specifications for the Science Classroom-Dining Hall Building at the State College in Lowell were so "fundamentally defective and inadequate" as to result in extra construction costs for which White, as the general contractor on the job, demanded compensation. The Commonwealth brought a third-party complaint[4] against Desmond & Lord, Inc., the architectural firm which drew the plans and specifications for the Lowell State College job.  Desmond & Lord moved for summary judgment on the third-party complaint.  That motion was allowed and, upon a determination by the judge that there was no just reason for delay,[5] judgment entered for Desmond & Lord.

In the companion case, the Commonwealth sought damages from Desmond & Lord and from various contractors who constructed buildings at the Cape Cod Community

---

[3] The provisions of §§ 30C and 30E were carried forward, without material change, to G. L. c. 6A, §§ 23 and 25, respectively, by St. 1969, c. 704, § 3, and to G. L. c. 7, §§ 41 and 43, by St. 1975, c. 311, § 2. Sections 41 and 43 were repealed by St. 1980, c. 579, § 7, which substituted a different scheme for designer selection and construction administration. See G. L. c. 7, §§ 42A-42K, inclusive.

[4] See Mass.R.Civ.P. 7 and 14, 365 Mass. 748 and 760 (1974).

[5] See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

College.[6]  Desmond & Lord brought Sepp Firnkas Engineering, Inc., a consulting structural engineering firm, into the case by third-party complaint.  The form of contract which the Commonwealth used to employ Desmond & Lord in this case was identical to that involved in the White case.  A different Superior Court judge allowed a motion for summary judgment in favor of Desmond & Lord and Sepp Firnkas because he felt bound by the summary judgment action taken by the judge in the earlier case.  As between the same parties, the Commonwealth and Desmond & Lord, the same issue had come up, was essential to the judgment and was adjudicated.  The second judge, therefore, believed his decision governed by the prior adjudication.  *Boyd* v. *Jamaica Plain Co-op. Bank,* 7 Mass. App. Ct. 153, 155 (1979).  Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, 1977).  Compare *Rudow* v. *Fogel,* 376 Mass. 587, 591-592 (1978).  However, the second judge expressed "grave reservations concerning the substantive propriety of this result" and reported his interlocutory order[7] allowing the motions for summary judgment to this court under Mass.R.Civ.P. 64, 365 Mass. 831 (1974).[8]  The two cases were then consolidated for argument.

What is striking about these cases is the manner in which the Commonwealth has run upon its own sword.  As we have noted, the Commonwealth drafted the instrument to govern the terms of all architectural services which it was engaging at that time.  Indeed, the record discloses an uncontroverted affidavit by the president of Desmond & Lord

---

[6] Jefferson Construction Company built the Commons Building; V & V Construction Co., Inc., built the Gymnasium and Maintenance Building; Loranger Construction Corp. built the Administration — Library Building; and Farwell Construction Corp. built the Auditorium — Arts Center Building.

[7] The second judge declined to order entry of judgment under Mass. R.Civ.P. 54(b).

[8] We need not decide whether the taking of an appeal by the Commonwealth from the judgment in the first case stayed its preclusive effect.  See *Commonwealth* v. *707 Main Corp.,* 371 Mass. 374, 377-378 n.2 (1976).

that "[t]here was no negotiation or discussion as to the terms and conditions of the [c]ontract, and it was given to Desmond & Lord, Inc. for signature after it had been prepared by plaintiff." The section of the contract now in controversy, Article XIII, appears as an entirely separate provision (i.e., it is not a subsection or subparagraph) captioned *"Release and Discharge."* Its full text is as follows:

> "ARTICLE XIII. *Release and Discharge.*
>
> Payment to the Designer by the Commonwealth pursuant to Paragraph 6 of ARTICLE XI above and acceptance of such payment by the Designer, shall release and forever discharge the Commonwealth and the Designer, respectively, from all claims, demands, and liabilities of every nature, whether in law or equity, asserted by either against the other and arising from or in any way connected with the Project, unless: (1) simultaneously with such acceptance the Designer shall advise the Commonwealth in writing of any such claim, demand, or liability asserted by the Designer against the Commonwealth; and (2) within six (6) months thereafter the Designer shall have taken action to enforce the same."

Paragraph 6 of Article XI provides that the architect shall be paid seventy-five percent of his fee "upon award of the Construction Contract," less all payments previously made.[9] Thus, by the literal terms of the contract, the architect is released from liability with all his supervisory work still to be done (those functions are discussed *infra*) and the correctness of his plans and specifications still to be tested.

In an effort to avoid the stark clarity of the language of Article XIII, the Commonwealth offers an affidavit by its

---

[9] The first five subparagraphs of Article XI provide for progress payments at various stages of the design work, e.g., submission of preliminary plans and outline specifications; approval of preliminary plans and specifications; when working plans and specifications are sixty percent complete, and so forth.

Director of the Bureau of Building Construction that neither he nor his predecessors (the affidavit is undated but was filed in court on December 27, 1979) interpreted Article XIII to release the designer when a project proceeded to construction; i.e., the release provision was to operate only in cases where the Commonwealth abandoned, during the design stage, the project for which the architect was drawing plans. A release, however, which is unequivocal in its terms cannot be explained by parol evidence. *Radovsky* v. *Wexler*, 273 Mass. 254, 258 (1930). If any exclusion from the scope of the release were intended, it would have to be stated. *Schuster* v. *Baskin*, 354 Mass. 137, 140 (1968). *Gaudette* v. *Kelly*, 7 Mass. App. Ct. 100, 104-105 (1979).

Deciding that the language of Article XIII means what it says does not, however, end the inquiry if the release provision in this public contract is not compatible with requirements of public law. The provisions of G. L. c. 7, §§ 30C and 30E,[10] entered the statutory scheme upon a recommendation (and proposed text) which appeared in the Eleventh Report of the Special Commission on the Structure of the State Government, 1953 House Doc. No. 2575. That report said that: cumbersome change order procedures in the system then governing State construction projects caused delay and consequent expense (*id.* at 7); and inadequate inspection resulted in losses to the Commonwealth (*id.* at 8). It foresaw benefits from more systematic and exacting inspections (*id.* at 12); and laid stress on the importance of inspection during the construction phase (*id.* at 25-26). The text of § 30C, which the Legislature adopted substantially in the form recommended by the report, provided, "The contract which the director of building construction shall make with the designer shall provide, among other appropriate terms, that the designer: . . . (3) shall be charged with general supervision of construction of the project; (4) shall appoint and employ a qualified clerk-of-the-works for the project who shall be approved by the director, shall devote

---

[10] See note 3, *supra*.

full time to the work of the project, oversee continuously the detail of construction, keep informed at all times of the financial status of the project, and make such investigations for and reports and recommendations to the designer or the director as either may require; . . ." In addition, the report recommended, and the Legislature enacted (see St. 1953, c. 612, § 5), G. L. c. 7, § 30E, which requires the designer to make recommendations on change orders proposed during the course of construction.

Those statutory requirements the Commonwealth faithfully incorporated in its contract. Notably, Article V, which deals with the scope of the designer's services, describes a third phase of the designer's work — a construction phase — during which the designer is to: "(3) visit the site or sites of the Project at least weekly to inspect the progress and quality of construction of the Project; (4) require each Consultant[11] . . . to make similar visits for the same purpose during the progress of that portion of the . . . construction to which the consultant's services relate and to report in writing thereon to the Designer; (5) report periodically to the Bureau [of Building Construction in the Division of Central Services of the Commonwealth's Executive Office for Administration and Finance] in writing on the progress of construction of the Project; (6) condemn all Project work which shall fail to conform to the Contract Documents; . . . (8) . . . act on all requests for change in plans, specifications, or contracts for the Project; and (9) upon written instructions from the Director [of Building Construction] furnish working plans and specifications for any such change." Article VII of the contract requires the designer to furnish to the Commonwealth a complete set of "as built" (i.e., with modifications in the original plans annotated) drawings on linen or mylar together with two copies of the "as built" plans.

---

[11] E.g., the mechanical engineer, the electrical engineer, or the structural engineer.

Since the contract contains what the statute requires, Desmond & Lord argues, there is no occasion to talk about the agreement's inconsistency with the statutory mandate. This argument, however, fails egregiously to pass the common sense test to which superficially logical arguments must be subjected. Presumably the representatives of the Commonwealth did not sign the contract with their fingers crossed behind their backs. As the Superior Court judge in the second case (involving Cape Cod Community College) observed, "the contract is thus self defeating." There is no point in calling upon the architect to make weekly site visits to inspect the progress and quality of construction, to report periodically to the Bureau and to rule on change orders if, reading Article XIII literally, the architect may, without incurring any liability, do that work incompetently or not at all. To be sure, there remains to the Commonwealth the leverage of holding up payments of the balance of the architect's fee (twenty-five percent),[12] but the statutory purpose of having the designer, who knows his own plans better than someone else, inspect the work he has designed and administer change orders would be thwarted.

The Eleventh Report of the Special Commission on the Structure of the State Government, which recommended passage of §§ 30C and 30E, emphasized the importance of continuity of designer responsibility from the drawing stage through the construction phase. See 1953 House Doc. No. 2575, at 10-11. It would not, therefore, be consistent with the statutory scheme to regard the release as effective with respect to the completed plans and specifications while ineffective as to the future supervisory and administrative duties of the designer. The statute treats the work expected of the architect indivisibly.[13] The correctness of the original

---

[12] Article XI of the contract provides that this balance is paid in six installments as the construction work proceeds.

[13] Performance of design and supervision duties by the same architect is not inevitable in private contracts between owners and architects. Document B 141 (1977 ed.) published by the American Institute of Architects

plans and specifications and certain change orders are generally interrelated. Nor do the schedules of compensation and progress payments which appear in Article VIII and Article XI, respectively, of the contract differentiate between design duties and supervisory duties.[14]

It was not within the power of the Director of Building Construction to nullify the statutory requirements. Officers of governmental agencies have authority to bind their governmental bodies only to the extent conferred by the controlling statute. *Fluet* v. *McCabe*, 299 Mass. 173, 178 (1938). The Bureau of Building Construction could not, therefore, relieve a designer from the construction administration duties which G. L. c. 7, §§ 30C and 30E, imposed. See *George A. Fuller Co.* v. *Commonwealth*, 303 Mass. 216, 223-224 (1939), in which it was held that the power to make and supervise contracts conferred by statute does not, in the absence of statute, carry with it the right to compromise claims and that a compromise agreement made by the Commonwealth was, therefore, unenforceable. Every presumption must be indulged that the Legislature "intended

and entitled "Standard Form of Agreement Between Owner and Architect," although it treats supervision by the architect as the norm in par. 1.5, contemplates in par. 1.5.2 that other provisions may be made by modifications to the standard agreement.

[14] Texts which consider agreements for architectural services assume that the architect shall be liable for design defects, see, e.g., Parker & Adams, The A.I.A. Standard Contract Forms and the Law 5-6 (1954), and, in discussing disclaimers of liability, do not go beyond disclaimers of responsibility for the acts of contractors and limits on consequential damages. See par. 1.1.21 of A.I.A. Document B 131 as appearing in Sweet, Legal Aspects of Architecture, Engineering and the Construction Process 880 (1970); Document B 141 (1977 ed.) published by American Institute of Architects pars. 1.55, 1.5.10 and 1.5.13; 1 & 2 Dib, Forms and Agreements for Architects, Engineers and Contractors c. 2, § 13 and c. 9, § 18 (1977 rev.).

Two States have declared unconstitutional on unreasonable classification grounds, a special limitation period on actions against architects, engineers, and contractors for damages arising from defective design or defective construction. See *Skinner* v. *Anderson*, 38 Ill. 2d 455, 459-461 (1967), and *Broome* v. *Truluck*, 270 S.C. 227, 230-231 (1978). We do not intimate whether we would reach the same conclusion of unconstitutionality.

to put in force a piece of legislation effectual to remedy the evil at which it appears to be aimed." *Morse* v. *Boston*, 253 Mass. 247, 252 (1925). Contract provisions which go beyond the scope of the statute are void. Cf. *New England Tel. & Tel. Co.* v. *Brockton*, 332 Mass. 662, 664-666 (1955) (municipality may not require rate discount by ordinance because State enabling legislation conferred no rate-making power upon cities and towns); *Ferrante* v. *Board of Appeals of Northampton*, 345 Mass. 158, 162-163 (1962) (zoning restrictions cannot be forfeited by action of public officers in disregard of statute); *New City Hotel Co.* v. *Alcoholic Beverages Control Commn.*, 347 Mass. 539, 542 (1964) (right of public to have liquor laws properly enforced cannot be forfeited by failure of officials to act). "The public interest in the enforcement of the laws of the Commonwealth cannot be defeated by failures of public officials to perform their duties." *Doris* v. *Police Commr. of Boston*, 374 Mass. 443, 449 (1978). Desmond & Lord, for its part, is bound by the general rule that persons who deal with a governmental agency must take notice of limitations upon that agency's contracting power and cannot recover upon a contract which oversteps those limitations. *Adalian Bros.*, v. *Boston*, 323 Mass. 629, 631 (1949). *Sancta Maria Hosp.* v. *Cambridge*, 369 Mass. 586, 595 (1976). *Marlborough* v. *Cybulski, Ohnemus & Associates*, 370 Mass. 157, 160-161 (1976). *Lawrence* v. *Falzarano*, 7 Mass. App. Ct. 591, 596 (1979), rev'd on other grounds, 380 Mass. 18 (1980).

Article XIII does not operate to relieve Desmond & Lord of its professional responsibilities under the contract, including, therefore, drawing plans sufficiently free from defects to satisfy the standard of care imposed upon architects. We note that the reciprocal provisions of Article XIII make no better sense (except in cases of abandonment of the work) insofar as they purport to release the Commonwealth from all liability, thus, seemingly, unburdening the Commonwealth of making the last six instalment payments

on the contract, even if the architect performs all his work impeccably.[15]

In the case brought by White Construction Co., Inc., the judgment is reversed; in the case brought by the Commonwealth, the orders for summary judgment are reversed.

*So ordered.*

---

[15] The parties have not briefed, and we do not decide, whether in Massachusetts a person licensed by the State to practice a profession may limit prospectively his liability for errors and omissions. Attempts by physicians and hospitals to limit their liability for negligence have been defeated on the ground that exculpatory provisions may stand only if the duties concerned do not involve the public interest. *Tunkl* v. *Regents of Univ. of California*, 60 Cal. 2d 92, 96 (1963). *Belshaw* v. *Feinstein*, 258 Cal. App. 2d 711, 725-727 (1968). *Olson* v. *Molzen*, 558 S.W.2d 429, 431-432 (Tenn. 1977). Sometimes the inability of a physician to avoid liability for negligent conduct has simply been assumed as obvious. See *Kozan* v. *Comstock*, 270 F.2d 839, 845 (5th Cir. 1959). See Annot., 6 A.L.R. 3d 704 (1963). See generally 15 Williston, Contracts § 1751 (3d ed. 1972) concerning provisions avoiding liability where status of a party imposes greater responsibility upon him than upon an ordinary person. For a case comparing the professional responsibility of an architect to that of a physician, see *Coombs* v. *Beede*, 89 Me. 187, 188 (1896).