HERMES AUTOMATION TECHNOLO-
GY, INC., et al., Plaintiffs, Appellants,

v.

HYUNDAI ELECTRONICS
INDUSTRIES CO., LTD.,
Defendant, Appellee.

No. 90–1235.

United States Court of Appeals,
First Circuit.

Heard June 8, 1990.

Decided Sept. 24, 1990.

Timothy Q. Feeley with whom James J. Marcellino, Anthony A. Bongiorno and Ga-

ston & Snow, Boston, Mass., were on brief, for plaintiffs, appellants.

Laura L. Carroll with whom Jerome Gotkin, Robert L. Kirby, Jr., and Widett, Slater & Goldman, P.C., Boston, Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and TORRES,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Hermes Automation Technology, Inc. ("Hermes") and its President, Chipin Song (collectively, "plaintiffs"), appeal from a judgment in the United States District Court for the District of Massachusetts, dismissing their claims against Hyundai Electronics Industries, Co. ("HEI"), and awarding attorney's fees against plaintiffs and their attorney. (Plaintiffs' attorney also appeals from the fee award). The issues on appeal are whether the district court erred in ruling that plaintiffs' claims were barred as a matter of law by the plain language of a settlement agreement between Hermes and Hyundai Electronics America, ("HEA"), which settled a previous state court lawsuit between HEA and Hermes, and whether the claims are barred by the doctrine of claim preclusion. We affirm in part, vacate in part, and remand.

## BACKGROUND

Since the district court dismissed the complaint on the ground that it failed as a matter of law to set forth a viable cause of action, we state the facts as alleged in the complaint, except insofar as those allegations have been conclusively rebutted by materials submitted to the district court, drawing all reasonable inferences in favor of plaintiffs. *See, e.g., Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987).

Hermes is a Massachusetts corporation that was founded by plaintiff Song and Hermes' former treasurer, Yung Kim, to develop and manufacture computer software. HEI is a Korean corporation, engaged in manufacturing and exporting of technological equipment. HEA is a California corporation which serves as the marketing arm for HEI in the United States. HEI owns 60 percent of the HEA stock and the remaining 40 percent is owned by another Hyundai affiliate, Hyundai Heavy Industries Co. All three companies are part of a Korean corporate conglomerate known as the Hyundai Group.

In September 1983, Song and Kim entered into a written agreement with HEA under which Song and Kim would form a corporation (Hermes) to develop certain high technology software and HEA would provide financing for the venture of up to $2,000,000. In exchange, HEA was to receive 49 percent of Hermes' stock and the exclusive marketing rights for the software products developed by Hermes.

Although the agreement stated that it was between HEA, on the one hand, and Song and Kim, on the other, the agreement was negotiated by HEI representatives as well as HEA representatives. In addition, HEI made representations indicating that it would ensure that Hermes would receive the funding needed for the venture, and led Song to believe that HEI "stood behind the Agreement as a guarantor." For this reason, Song insisted that HEA's officer sign the agreement once on behalf of HEA and separately, as an authorized representative of HEI. In reliance on this agreement, Song and Kim left their prior employment and made substantial investments in starting up and operating Hermes. On September 16, 1983, HEA advanced Song and Kim the initial payment of $41,000, as provided for in the agreement.

In October 1983, HEI informed Song and Kim that funding under the September agreement would be withheld unless certain changes were made in the agreement. Fearing that HEI would withdraw all funding for the venture, Song and Kim agreed to the changes, and on October 14, 1983, Hermes entered into an "understanding of memorandum" with HEA. This second agreement provided that HEA was to own

* Of the District of Rhode Island, sitting by designation.

50% of Hermes' stock, and made certain other changes regarding royalties and Hermes' operating structure. The second writing stated that it was an agreement between HEA and Hermes, but as with the September writing, it was executed by HEI as well as HEA.

In November 1983, an HEI and HEA representative presented Song and Kim with an additional formal writing to be signed. Although HEI had previously assured Song and Kim that the additional written agreement would formalize the material terms of the October agreement, the proposed November agreement contained material changes including a provision giving HEA the controlling interest in Hermes. Hermes refused to assent to this modified agreement and the additional formal writing was never signed. However, on November 22, 1983, HEI indicated that it would grant Hermes' request for an advance of $214,000, if Hermes would execute a promissory note for this amount plus the amount of the September payment. Hermes signed the note and received the payment.

Throughout this time, beginning with the signing of the September agreement, HEI used its financial leverage over Hermes to exact concessions from Hermes in favor of HEI and HEA, and to assert further control over Hermes' operations. After the second payment in November, HEI continued its pattern of assuring Hermes that the necessary funding for the venture was forthcoming, while at the same time refusing Hermes' requests for further funding, and using its relationship with Hermes to supervise, oversee, and interfere with Hermes' operations.

In March 1984, after several months of haggling between Hermes and HEA and HEI, Hermes informed HEA that it could not accept any further changes in the prior agreements and demanded that HEA and HEI provide immediate additional funding. HEI and HEA refused to provide the requested funding. On March 22, 1984, HEA demanded payment on the promissory note which had been executed by Hermes in November 1983.

After Hermes refused to pay on the promissory note, HEA brought an action against Hermes in Massachusetts state court seeking to recover $255,000 allegedly due on the note. Hermes counterclaimed against HEA, alleging breach of contract, misrepresentation, misappropriation of trade secrets, unfair and deceptive trade practices, and violation of Mass.Gen.Laws ch. 93, § 42. Hermes sought to enjoin HEA from exploiting misappropriated trade secrets and from marketing products developed by Hermes. Hermes also sought $3,000,000 in damages.

After discovery in the state court action, HEA and Hermes agreed in June 1988 to settle. HEA agreed to pay Hermes $460,-000. In addition, HEA and Hermes entered into an agreement releasing one another from liability for all claims arising out of their prior dealings. Section 5.1 of the agreement provides:

> Except as to such rights or claims as may be created by this Agreement, [Hermes] hereby releases, remises and forever discharges [HEA], its corporate successors or predecessors of and from all claims, debts, demands, actions, causes of action, suits, accounts, contracts, agreements, damages, and all claims, demands, and liabilities of every nature heretofore or hereafter arising out of, connected with or incidental to the dealings between the parties which [Hermes] has or ever had prior to the effective date hereof, including, without limitation on the generality of the foregoing, any and all claims, demands, and cause or causes of action that were raised or could have been raised in the [state court action].

Section 5.2 of the agreement contains a similar provision under which HEA released Hermes from any claims it has or had against Hermes arising out of the dealings between them. Pursuant to the settlement agreement, the state court action was dismissed with prejudice. HEI was not a party to the state court action, nor was it a party to the settlement agreement.

In January 1989, Hermes and Song brought this diversity action against HEI

in the United States District Court for the District of Massachusetts. The complaint alleges that HEI engaged in a scheme of fraud, duress, and tortious interference with contractual relations, through which HEI induced plaintiffs to expend substantial sums in forming and operating Hermes and through which HEI misappropriated plaintiffs' trade secrets and proprietary information. The complaint asserts largely the same claims and allegations as were made in Hermes' state court counterclaim against HEA, including claims of contract breach, misrepresentation, misappropriation of trade secrets, unfair and deceptive practices, and violation of Mass.Gen.Laws ch. 93, § 42, except that the federal court complaint is based on the alleged wrongdoing of HEI and its representatives, while the state court complaint was based on the alleged wrongdoing of HEA and its representatives. The federal court complaint against HEI also contains additional allegations of breach of fiduciary duty, economic duress, and tortious interference with contractual relations, that were not included in the state court counterclaim. Plaintiffs seek injunctive relief, damages of $17,000,000, and attorney's fees.

HEI moved to dismiss the complaint, arguing that plaintiffs' claims were barred by the plain language of section 8.3 of the settlement agreement.[1] Section 8.3 provides:

> This agreement is binding upon and shall inure to the benefit of the parties hereto, their respective agents, employees, representatives, officers, directors, divisions, subsidiaries, *affiliates*, assigns, heirs, successors in interest, and *shareholders*. (emphasis added).

HEI argued that it was released from any liability on claims arising out of its dealings with Hermes, because it is both a shareholder and affiliate of HEA, and that this release was binding on Song, as an officer of Hermes. HEI further argued that this interpretation was supported by section 2.3 of the agreement which provides:

> It is the intention of the parties hereto to settle and dispose of, fully and completely, any and all claims, demands, and cause or causes of action heretofore or hereafter arising out of, connected with or incidental to the dealings between the parties hereto prior to the effective date hereof, including without limitation on the generality of the foregoing, any and all claims, demands, and cause or causes of action reflected in the [state court action].

Plaintiffs argued that their claims were not barred by the release agreement, because the parties to the agreement did not intend to release HEI from independent claims against it. Plaintiffs offered evidence of prior drafts of the agreement under which Hermes would have explicitly released HEI from all liability and HEI would have explicitly released Hermes from all liability. They argued that the provisions releasing claims between HEI and Hermes were omitted from the final agreement in order to preserve any such claims. Plaintiffs also offered an affidavit of one of the negotiators stating that the parties' intent was that "HEA alone would release Hermes from liability, and that Hermes would release only HEA from liability."

The district court held, however, that, as a matter of law, plaintiffs' claims were barred by the unambiguous language of section 8.3 of the settlement agreement between Hermes and HEA. The court also relied on section 2.3, which it interpreted as an expression of intent to resolve all claims, including those involving third parties such as HEI, which arose out of the dealings between HEA and Hermes. In view of the agreement's integration clause,[2] the court ruled that under the par-

---

1. HEI also argued that all the claims were barred by claim preclusion; that counts I–III failed to state a claim, because HEI was not the real party in interest; and that counts III–IX were barred by the statute of limitations. HEI has not raised the latter two issues on appeal.

2. Section 8.2 of the agreement states:
 This Agreement is the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and discussions. This Agreement may be amended only by an agreement in writing.

ol evidence rule, plaintiffs' evidence of prior negotiations could not be used to show that the parties' intent was contrary to the plain language releasing HEI.

Following its dismissal of plaintiffs' claims, the district court ruled on HEI's motion for sanctions and attorney's fees. The court held that the complaint was frivolous in light of the plain language of the settlement agreement. It therefore held that under Federal Rule of Civil Procedure 11, plaintiffs and their attorney were jointly and severally liable for HEI's attorney's fees. The court also held (as an alternative ground for the award against Hermes and Song) that Hermes and Song were liable for HEI's attorney's fees under section 8.5 of the settlement agreement which provides, "in the event of litigation relating to this agreement ... the prevailing party shall be entitled to attorneys' fees."

## DISCUSSION

### I. *The Effect of the Settlement Agreement*

While plaintiffs contend that the plain language of the agreement compels the conclusion that Hermes did not release HEI, a contention we reject, *see* note 6, below, their primary argument is that the language of the agreement does not *unambiguously* release HEI from the claims asserted here. Accordingly, they argue that the district court erred in refusing to construe the agreement in accordance with the extrinsic evidence of the parties' intent.

HEI responds by arguing that the agreement—specifically, sections 8.3 and 2.3—unambiguously released HEI from any liability to Hermes (and Song) and that since the written release represents the entire agreement, Hermes' proffered extrinsic evidence cannot serve to vary its terms. HEI also emphasizes that the present claims appear to be largely duplicative of the

counterclaims asserted by Hermes against HEA in the state court action.

■ Whether the plain language of the release agreement unambiguously discharged the present claims, barring the use of parol evidence to show a contrary intent and requiring dismissal of the claims, is a question of law to which we give plenary review. *See, e.g., Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989) (where the district court "interpreted and applied the Agreement, determining that there were no ambiguities for the jury to resolve," such determinations "were 'legal' judgments and our review of them is, therefore, plenary"); *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2nd Cir.1988) ("the determination of whether a contract term is ambiguous— and thus whether parol [evidence] may be considered—is a threshold question of law for the court.... We review [the district court's] determination *de novo*."). The parties do not dispute that this question, and the scope of the release agreement generally, is governed by Massachusetts law.[3]

Until 1963, Massachusetts followed the common law rule that the release of one joint tortfeasor had the effect of releasing all other joint tortfeasors. *See, e.g., Fleming v. Dane*, 298 Mass. 216, 10 N.E.2d 85, 86 (1937). In 1962, however, the Massachusetts legislature enacted Mass.Gen.Laws ch. 231B, making it applicable to all torts occurring on or after January 1, 1963. That statute provides that "a release or covenant not to sue ... given in good faith to one of two or more persons liable in tort for the same injury ... shall not discharge any of the other tortfeasors from liability for the injury unless its terms so provide; but it shall reduce the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater." Mass.Gen.Laws ch. 231B § 4(a). Chapter 231B was based on the Uniform Contribution Among Tort-

---

**3.** Section 8.1 of the agreement states:
This Agreement shall be deemed to have been executed and delivered within the Commonwealth of Massachusetts, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with, and governed by, the laws of the Commonwealth of Massachusetts.

feasors Act [the "Uniform Act"],[4] and was intended to abrogate the common law rule. *See Selby v. Kuhns,* 345 Mass. 600, 188 N.E.2d 861, 865 (1963) (Section 4 of chapter 231B effects a "statutory rejection of the [common law] doctrine of unity of discharge"); *See also Alsup v. Firestone Tire & Rubber Co.,* 101 Ill.2d 196, 77 Ill.Dec. 738, 740, 461 N.E.2d 361, 363 (1984) ("A purpose of the uniform act was to abrogate the common law rule that the release of one joint tortfeasor releases all joint tortfeasors.") (citing Unif. Contribution Among Tortfeasors Act, Commissioners' Prefatory Notes, 12 U.L.A. 57, 59–62 (1975)).[5]

■ Although we have uncovered no Massachusetts authority specifically addressing whether this same rule applies to the release of a joint contractual obligor, we believe the Massachusetts courts would apply the modern rule to joint contractual obligers as well as to joint tortfeasors. *See Eastern Electrical Co. v. Biltman Construction Corp.,* 11 Mass.App. 192, 414 N.E.2d 1023, 1030 (1981) ("limits should be placed upon application of the old rule (assuming that it should be applied at all) that at least a voluntary discharge or release of one joint obligor has the effect of releasing all joint obligers"). *Cf. Selby v. Kuhns,* 188 N.E.2d at 865–66 ("The effect of th[e] statutory rejection of the doctrine of unity of discharge in the large class of cases in which it has been chiefly applied discredits the doctrine generally and tends to support our refusal to apply it to a case in a related class [that of "successive tortfeasors"] which arose prior to January 1, 1963."). *See also Community School District of Potsville v. Peterson,* 176 N.W.2d 169, 173 n. 1 (Iowa 1970) ("The principles [concerning the scope of a release] apply whether the actions sound in tort or contract and

also whether the torts are joint or several."); 4 *Corbin on Contracts* § 931, at 355 (Supp.1990) (discussing case that "abandons and reverses the ancient rule that a release of one tort-feasor releases all other jointly liable with him" and concluding that "Undoubtedly the same result obtains in the case of a release of one of several joint contractors"). *See generally id.* at 357 (discussing cases which abandon the "archaic and senseless strictures of the early common law" governing the release of joint obligers, "in favor of the modern approach of giving effect to the intentions of the parties"). *But see New England Merchants National Bank v. Rosenfield,* 679 F.2d 467, 472 n. 9 (5th Cir.1982) (stating that in Massachusetts, the common law rule "remains applicable to contract cases"), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 819, 74 L.Ed.2d 1017 (1983).

■ Thus, under Massachusetts law, plaintiffs' claims against HEI for its own wrongful conduct were not released by the mere fact that Hermes released HEA. Hermes' release of HEA has the effect of releasing HEI from any independent contractual or tort liability only to the extent the terms of the agreement "so provide." As in other questions of contract interpretation, whether the agreement provides for the release of HEI is generally determined by the intent of the parties to the agreement. *See, e.g., Bjork v. Chrysler Corp.,* 702 P.2d 146, 161 (Wyo.1985) ("Whether the 'terms so provide' [that the release discharges other tortfeasors] is a question of intent."); *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971) ("The straightforward rule is that a party releases only those other parties whom he intends to release."); *State Ex Rel Norman-*

---

4. *See Noyes v. Raymond,* 28 Mass.App. 186, 548 N.E.2d 196, 199 (1990) ("General Laws c. 231B, adopted in Massachusetts in 1962, is based upon the 1955 version of the Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 63 (Master ed. 1975)").

5. Even prior to the adoption of the Uniform Contribution Among Tortfeasors Act, the Massachusetts courts had begun to erode the common law rule by holding that a "covenant not to sue"

one of several tortfeasors, as opposed to a release, would not have the effect of releasing the other tortfeasors unless the parties to the covenant so intended. *See, e.g., Matheson v. O'Kane,* 211 Mass. 91, 97 N.E. 638 (1912). *See also Selby,* 188 N.E.2d at 865 ("Section 4 of c. 231B establishes for cases of prior release the rule long advocated by the commentators and heretofore in substantial part applied by this court in cases of covenants not to sue.").

*dy Orthopedics v. Crandall*, 581 S.W.2d 829, 833 (Mo.1979) ("As with any other contract, the lodestar of construction [of a release agreement] should be 'that the intention of the parties shall govern.' "); Keeton, Dobbs, Keeton, and Owen, *Prosser and Keeton, Law of Torts*, § 49, at 335 (5th ed. 1984) ("[A] plaintiff should never be deprived of a cause of action against any wrongdoer when the plaintiff has neither *intentionally* surrendered the cause of action nor received substantially full compensation. If the statutes are taken into account, this is now the rule actually applied in most American jurisdictions.") (emphasis added). *See also McMahon v. Monarch Life Insurance Co.*, 345 Mass. 261, 186 N.E.2d 827, 830 (1962) (contract should be construed "in a manner which will carry out the intention of the parties").

 Questions of party intent are generally determined with reference to all the circumstances surrounding the making of the agreement, as well as the actual language of the agreement. *See, e.g., Louis Stoico, Inc. v. Colonial Development Corp.*, 369 Mass. 898, 343 N.E.2d 872, 875 (1976). However, where the language of an integrated release agreement is unambiguous as applied to the question at hand and the intent of the parties is clear solely on the basis of that language, the parol evidence rule bars the use of extrinsic evidence to contradict that plain language. *See Tupper v. Hancock*, 319 Mass. 105, 64 N.E.2d 441, 443 (1946) ("Where, as here, the releases were absolute and unequivocal in their terms, they cannot be explained by parol evidence and must be construed according to the language the parties have seen fit to use."); *White Construction Co., Inc. v. Commonwealth*, 11 Mass.App. 640, 418 N.E.2d 357, 360 (1981) ("A release, however, which is unequivocal in its terms cannot be explained by parol evidence."), *affd*, 385 Mass. 1005, 432 N.E.2d 104 (1982).

 The mere failure to *name* HEI in haec verba in sections 8.3 and 2.3 does not strike us as, by itself, dispositive of the release issue. However, in the circumstances of this case, we need not speculate as to the future course of Massachusetts law in this area. Even assuming that designations such as "shareholders" and "affiliates" are sufficient to identify HEI, which falls into both of these classes, we nonetheless cannot agree that section 8.3 or any other part of the agreement unambiguously *releases* HEI (as opposed to HEA) from Hermes' claims. The operative release provisions of the agreement are found solely in sections 5.1 and 5.2. These do not mention HEI by name, *nor do they mention any category of persons or entities that include HEI.* Under the terms of section 5.1, Hermes *released* only HEA and "its corporate successors or predecessors." HEI does not purport to be either a successor or predecessor of HEA. The fact that the agreement explicitly releases "successors and predecessors" without explicitly releasing "shareholders and affiliates" suggests that any "benefit" extended to shareholders and affiliates by section 8.3 was, or at least may be, something different from the benefit of complete release which inured to successors and predecessors under section 5.1. It would have been easy, and indeed most consistent with the format of the agreement, to have inserted HEI by name, or by categoric designation, in section 5.1 were it intended to release HEI from all of Hermes' claims. This was not done.

 Section 8.3 and section 2.3 of the agreement do not necessarily rebut this inference. Section 8.3 states that the "agreement is binding upon and shall inure to the benefit of the parties hereto, their respective agents, employees, representatives, officers, directors, divisions, subsidiaries, affiliates, assigns, heirs, successors in interest, and shareholders." To be sure, this provision can be construed, as the district court held, to fully release HEI, as both a shareholder and affiliate of HEA, from liability for any of its conduct in dealing with Hermes.[6] On the other hand,

---

**6.** Because we conclude that one *possible* interpretation of this "inure to the benefit" language was that it released HEI from any liability for its prior dealings with Hermes, we reject plain-

the parties may have included section 8.3 simply to ensure that Hermes could not circumvent the release of HEA by suing a person or entity associated with HEA on a theory of derivative liability. Thus, section 8.3 may have been intended not to release shareholders and affiliates from any liability for their own wrongdoing, but rather to release them from any possible derivative liability for the wrongdoing of HEA, by extending to shareholders and affiliates the benefit of the *release of HEA* contained in section 5.1.

■■■ It can be argued that to interpret section 8.3 as only discharging derivative claims renders that section superfluous. Under the common law, there would be no need to include a clause releasing claims based on derivative or vicarious liability, because that result would obtain as a matter of law, at least absent a reservation of rights to such claims. *See Karcher v. Burbank,* 303 Mass. 303, 21 N.E.2d 542, 545 (1939) (indicating that a covenant not to sue a tortfeasor discharges third persons whose "liability is of a derivitive [sic] or secondary character, resting solely upon the doctrine of respondeat superior," unless the covenant contains an express reservation of rights).

Under the modern rule embodied in chapter 231B, section 4, however, it is not clear that the release of HEA would discharge derivative claims, if the "inure to the benefit" clause had not been included. While a person who is only vicariously liable for the tortious conduct of another may not technically be a joint tortfeasor, the majority of courts addressing the question have held that the language "one of two or more persons liable in tort for the same injury," used in the Uniform Act (and in section 4 of the Massachusetts statute), encompasses vicariously liable persons, as well as traditional joint tortfeasors. *See, e.g., Smith v. Raparot,* 101 R.I. 565, 225 A.2d 666, 667 (1967) (holding that under the plain language of the Uniform Act, a release of a servant which by its terms applies only to

the servant's liability does not release the master of claims under respondeat superior doctrine); *Van Cleave v. Gamboni Construction Co.,* 101 Nev. 524, 706 P.2d 845, 847–49 (1985). *See generally Krukiewicz v. Draper,* 725 P.2d 1349, 1351–52 (Utah 1986) (indicating that all jurisdictions but one have held that the release provision of the Uniform Act applies to vicarious liability situations). *But see Craven v. Lawson,* 534 S.W.2d 653, 655–57 (Tenn.1976) (Uniform Act does not apply to situations involving derivative or vicarious liability).

In *Richmond v. Schuster Express, Inc.,* 16 Mass.App. 989, 454 N.E.2d 494, 495 (1983), a Massachusetts appellate court indicated that *Karcher* remains good law. The *Richmond* court did not, however, discuss chapter 231B, section 4, and hence did not explicitly rule on whether the statute applies to vicarious liability situations. In any event, we need not decide how the Massachusetts Supreme Judicial Court would resolve the issue. The matter is uncertain enough that it would not be unreasonable for parties to a release agreement to include a provision that served solely to discharge "agents, employees, representatives, officers, directors, divisions, subsidiaries, affiliates, assigns, heirs, successors in interest, and shareholders," from vicarious or derivative liability.

■■■ HEI argues that the plain language of section 2.3 of the agreement, relied on by the district court in its memorandum order on the attorney's fees issue, removes any doubt that the agreement was intended to fully release HEI. We disagree. Section 2.3 states the parties' intent to settle "all claims ... arising out of, connected with or incidental to the *dealings between the parties*" (emphasis added). While section 2.3 could be read to suggest that the parties intended to settle all disputes, even those involving third parties such as HEI, that arose out of Hermes' dealings with HEA and HEI, that is not the only reasonable interpretation. Another possible reading is that the parties intended

tiffs' argument that the plain language of the agreement "requires the conclusion that plain-

tiffs' claims against [HEI] were not released."

to settle all claims between the parties to the state court action and to the agreement —i.e., Hermes and HEA. That interpretation is supported by language in section 2.1 of the agreement stating that "Certain disputes and controversies have arisen among *the parties hereto.*" (emphasis added).

We, conclude, therefore, that the district court erred in ruling that the agreement unambiguously released HEI from liability for all claims arising out of its dealings with Hermes, so as to preclude consideration of extrinsic evidence on the issue of the parties' intent. Given the above ambiguities in the language of the release agreement, plaintiffs were entitled to have that language construed in light of the extrinsic evidence on the issue of what claims against HEI the parties to the agreement intended to release. *See Robert Industries, Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407, 409 (1973) ("When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms."); *Keating v. Stadium Management Corp.*, 24 Mass.App. 246, 508 N.E.2d 121, 123 (1987) (same).

The district court's memorandum opinions in this case indicate that the court rested its conclusion that Hermes' present claims were barred by the release agreement, in part, on its perception that these claims against HEI are "virtually identical" to the counterclaims asserted against HEA in the state court action. For example, the court stated:

In many instances identical language has been used in both the earlier counterclaim and the present complaint. Plaintiffs are simply attributing to HEI the conduct attributed to HEA in the first action. There is no way that plaintiffs can prove these causes of action without proving the claims previously asserted,

and then released by the settlement agreement.

▪ We agree that to the extent that Hermes is simply seeking to hold HEI liable *for the wrongful conduct of HEA*, such derivative claims would be plainly barred by the "inure to the benefit" clause contained in section 8.3 of the agreement.[7] Some of Hermes' claims fall into this category as a matter of law, and were, therefore, properly dismissed. Several of the claims, however, do not on their face seek to hold HEI derivatively liable.

▪ Count I alleges a breach of contract by HEI. The two agreements which give rise to this alleged contract, however, were, by their express terms, entered into by HEA and not by HEI. While the agreements were signed by HEI, as well as HEA, neither agreement contains language imposing any obligations on HEI. To the extent that HEI's signature on the contract might have been intended as a guaranty on behalf of HEA, any claim based on HEI's failure to guarantee HEA's obligations would be derivative of the claims against HEA. *Cf. Karcher v. Burbank*, 303 Mass. 303, 21 N.E.2d 542, 545 (1939) (indicating that claims seeking to impose liability on a surety for the principal's negligence are derivative claims). We, therefore, hold, as a matter of law, that the contract claim was barred by the release agreement.

▪ Counts II and III allege a breach of a duty of good faith and fair dealing, and a breach of fiduciary duty. As with the contract claim, these counts are based on obligations on the part of HEI which allegedly arose out of the two written agreements. Since these agreements were between Hermes and HEA, rather than HEI, these claims, like the contract claim, seek to hold HEI derivatively liable for HEA's failure to live up to the contract. Thus, they are likewise barred by the release agreement.

▪ However, the remaining counts— fraudulent misrepresentation; misappropri-

---

7. Indeed, plaintiffs' proffered interpretation of section 8.3 is that it was intended to discharge any claims that are derivative of the claims against HEA which were released in section 5.1 of the agreement.

ation of trade secrets; violation of Mass. Gen.Laws ch. 93; unfair and deceptive trade practices; economic duress; and interference with contractual relations—appear in a different light.[8] Although the allegations in these counts all relate to plaintiffs' dealings with HEA and HEI, they do not rely on HEI's alleged obligations under the Hermes–HEA contract. To be sure, some of these counts make virtually identical allegations as were made in the state court counterclaim. For example, count V of the complaint appears to allege the same misappropriation of trade secrets as was alleged in count III of the state court counterclaim. Nonetheless, the present complaint alleges that the wrongful conduct was committed by HEI rather than HEA and plaintiffs maintain that such conduct was independent from the misfeasance of HEA. HEI has not yet demonstrated that as a matter of law the alleged wrongful conduct was committed solely by HEA. Plaintiffs have, therefore, at least at this preliminary stage, raised a genuine issue of material fact as to whether the alleged wrongful actions were committed by HEI in a capacity independent from HEA.[9]

## II. *Res Judicata*

 HEI argues, as an alternative ground for affirmance of the district court's dismissal of plaintiffs' claims, that the claims are barred by the doctrine of res judicata or, more precisely, claim preclusion. Since the judgment which allegedly bars the present suit was rendered by a Massachusetts state court, Massachusetts law determines the claim preclusive effect of that judgment. *See, e.g., Rose v. Harwich*, 778 F.2d 77, 79 (1st Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986). Under Massachusetts principles of claim preclusion, a final judgment in one action generally precludes the

plaintiff from bringing another action against the same defendant if the second action arises out of the same transaction or occurrence as the prior action. *See* Restatement (Second) of Judgments, § 24 (1982); *Boyd v. Jamaica Plain Co-operative Bank*, 7 Mass.App. 153, 386 N.E.2d 775, 781 (1979) (quoting tentative draft of Restatement (Second)). Unlike issue preclusion, which is not applicable here, claim preclusion generally applies only to actions between parties to the prior litigation, or between a party to the prior litigation and a person whose interests were represented by a party to the prior litigation. *See, e.g., Mongeau v. Boutelle*, 10 Mass.App. 246, 407 N.E.2d 352, 356 (1980) ("[T]he rules of prior adjudication apply to nonparties only where a person's interest was represented by a party to the prior litigation. There has to be a 'sufficient legal identity' between the interest of the person allegedly represented and the prior litigant for the later claim to be precluded.") (citations omitted); *Roche v. Roche*, 22 Mass.App. 306, 493 N.E.2d 523, 525 (1986) ("A person who is not a party to the prior action *but whose interest is represented by a party* may have the benefit of the judgment in the prior case.") (emphasis added).

 Plaintiffs do not dispute that their claims against HEI arose out of the same transactions and occurrences as Hermes' prior state court counterclaims against HEA. They argue, however, that HEI is not entitled to invoke claim preclusion, because it was not a party to the prior action and has not shown a "sufficient legal identity" between its interest and HEA's interest in the prior litigation. We agree. That HEI is the prime shareholder and affiliate of HEA does not, by itself, enable HEI to invoke the claim preclusive effect of judgments in actions to which HEA was a party. *See generally* 18 Wright, Miller, & Cooper, *Federal Practice*

---

**8.** HEI argued in the district court that counts III–IX were barred by the statute of limitations. Since this issue was not addressed by the district court and HEI has not raised it on appeal, we express no view on whether the remaining claims are barred by the statute of limitations.

**9.** Even if HEI did engage in the alleged wrongful conduct, apart from HEA's conduct, the present claims may still, of course, be barred by the release agreement. We hold only that plaintiffs were entitled to have the language of the release agreement construed in light of the extrinsic evidence of the parties' intent.

and Procedure, § 4460, at 533–36 (1981). HEI has, moreover, made no conclusive showing that HEA was representing HEI's interests in the prior litigation, nor has it shown that as a matter of law, plaintiffs' present claims are in all instances (see supra) derivative of the released claims against HEA. Thus, on the present record, we are unable to say that HEI is entitled to claim the benefit of the judgment in the prior action between Hermes and HEA. See Roche, 493 N.E.2d at 525 ("Since [defendant] played no role directly or vicariously in the [prior litigation], we are of the opinion that he is not entitled to claim a benefit from the judgment in that case.").[10]

HEI's argument that Capraro v. Tilcon Gammino, Inc., 751 F.2d 56 (1st Cir.1985), supports preclusion here is without merit. In Capraro, we held that under Rhode Island law, a defendant was entitled to invoke the claim preclusive effect of a prior judgment in favor of its wholly owned subsidiary. However, the claims against the parent corporation which we held to be precluded were not alleged to be independent from the claims against the subsidiary, as they are here. Rather, the plaintiffs in Capraro sought relief against the parent corporation based on the latter's "alleged responsibility for the conduct of its wholly-owned subsidiary." Id. at 59.

HEI also relies on In re El San Juan Hotel Corp., 841 F.2d 6 (1st Cir.1988). While our decision there is more on point, it is still not controlling. In San Juan, we suggested that under federal law, nonmutual claim preclusion may be invoked by defendants who were not parties to the original action, "if the new defendants have a close and significant relationship with the original defendants." Id. at 10.

We further held that claim preclusion was applicable in that case, because the new defendant "shared a significant relationship" with the original defendant, as the "co-perpetrator" of "allegedly joint harms." Id. at 11. We found to be "critical" the fact "that both actions purported to address the various ways in which [the original defendant] or [the original and the new defendant] jointly, caused financial harm to the [plaintiff]". Id. at 11 n. 9.

■ Whether or not HEI would be entitled to invoke claim preclusion under the federal law principles announced in San Juan, those principles are inapplicable here, where we must apply Massachusetts preclusion rules. As indicated above, the general Massachusetts rule is that claim preclusion may be invoked by a person who was not a party to the prior action only if that person's interest was represented by a party to the prior action. This standard would not necessarily encompass all defendants who shared "a close and significant relationship" with a defendant to the prior action. HEI has cited to no Massachusetts authority indicating that the Massachusetts courts would follow the rule of nonmutual claim preclusion applied in San Juan. Indeed, in an analogous context the Massachusetts Supreme Judicial Court has stated that Massachusetts preclusion rules are narrower than those imposed by federal law. See Whitehall Co., Ltd. v. Barletta, 404 Mass. 497, 502, 536 N.E.2d 333, 336–37 (1989) (noting that federal law would permit offensive use of nonmutual issue preclusion in situations in which Massachusetts law would require technical privity). Moreover, while the San Juan opinion relied primarily on the fact that the alleged

---

**10.** Even if plaintiffs' claims would otherwise be barred by claim preclusion, it is not clear that the prior judgment entered pursuant to a settlement agreement would bar claims that the parties to the agreement did not intend to discharge. See generally 18 Wright, Miller, & Cooper, Federal Practice and Procedure § 4443, at 384 (1981) ("The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties."). Cf. Boyd v. Jamaica Plain Co-op Bank, 7 Mass.App. 153, 386 N.E.2d 775, 783 (1979) (suggesting that if there had

been an "agreement to split the claim" claim preclusion would not apply). But see 1B Moore, Lucas, & Currier, Moore's Federal Practice ¶ .409[5], at 330–31 (2d ed. 1988) ("But the fact remains that the [consent] judgment is not an inter partes contract. . . . [T]he judgment, if it is on the merits, is a judgment in bar when rendered for the defendant; and when rendered for the plaintiff, merges plaintiff's underlying claim into the judgment and any further claim by plaintiff is on the judgment and not on the underlying claim.").

wrongs were caused jointly by the original and new defendants, under Massachusetts law, a defendant is not entitled to invoke claim preclusion simply because he acted jointly with the defendant to the prior litigation. *See Mongeau v. Boutelle,* 10 Mass.App. 246, 407 N.E.2d 352, 358 n. 10 (1980) ("There is no privity between joint tortfeasors [for res judicata purposes], because all are jointly and severally liable.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed as to counts I, II, and III, and vacated as to the remaining counts. The latter counts are remanded for further proceedings consistent with this opinion. The attorney's fees awards are vacated, without prejudice to HEI's right to renew its motions for fees under the agreement and under Rule 11 if the circumstances as further developed below so justify.

■■■ Plaintiffs have requested that we "order reassignment of this case upon remand." While we have no doubt that the original district judge could handle plaintiffs' claims with unquestionable fairness, we recognize that the judge's strong criticism of plaintiffs' claims as not only frivolous, but verging on fraudulent, might lead to an *appearance* of unfairness should the same district judge ultimately decide against plaintiffs. We, therefore, order that the case be reassigned to a different judge upon remand. *See Maldonado v. Valazques Garcia,* 821 F.2d 822, 832 (1st Cir.1987) ("appellate courts will ... order reassignment of a case upon remand where necessary to preserve the appearance of fairness"). *See also In re Dedham Water Co.,* 901 F.2d 3 (1st Cir.1990).

*Affirmed, in part, Vacated, in part, and Remanded. No costs at this time.*